MITCHELL BERENSON et al., Respondents, v TOWN OF NEW CASTLE, Appellant.

Second Department, April 23, 1979

## APPEARANCES OF COUNSEL

*Paul, Weiss, Rifkind, Wharton & Garrison (Edward N. Costikyan, Steven S. Honigman, Deborah E. Jordon* and *Gregory J. Wallance* of counsel), for appellant.

*Shamberg & Bender, P. C. (Stuart R. Shamberg, Martin Bender* and *Mary Korth* of counsel), for respondents.

*Gifford, Woody, Palmer & Serles (John T. Buckley* of counsel), for Washington Avenue Homeowners, *amicus curiae.*

## OPINION OF THE COURT

GULOTTA, J.

■ The plaintiffs have secured a declaratory judgment invalidating the zoning ordinance of the Town of New Castle to the extent that it fails to make adequate provision for multifamily housing. (At the time this action was commenced, the ordinance totally excluded multifamily residential housing from the list of permitted uses. A subsequent amendment, examined in proposal form at the trial and enacted prior to Special Term's decision, purports to provide for 100 to 150

units of multifamily housing, as a permitted use, in the central business district of Chappaqua.) The issue on appeal is *not* whether the Town of New Castle may permissibly exclude multifamily housing from within its borders. The town now concedes that its total exclusion was improper and contends that the interim amendment of its zoning ordinance "is just the beginning of a process of experimentation in accommodating alternative housing forms including multi-family housing". Rather, the issue before us is whether the far-reaching remedial provisions of the judgment may be sustained. We hold that, for the most part, they may not.

The background facts were succinctly stated by the Court of Appeals on a prior appeal in this case, which resulted in an affirmance of the denials of cross motions for summary judgment *(Berenson v Town of New Castle,* 38 NY2d 102, 105-106):

"The Town of New Castle is a relatively quiet and undeveloped suburban community nestled in the hills of northern Westchester County. The town is but 35 miles north of New York City, and this close proximity to a major metropolitan center has placed it directly in the path of the post-World War II rush to suburbia. Since 1950, New Castle has experienced a three-fold increase in population, growing from 5,312 inhabitants to over 17,000. The town fathers, anxious to preserve as much of the rustic township as they could, took steps to prevent the construction of both apartment houses and small one-family homes in the town. Ever since the first zoning ordinance was adopted by New Castle, the town has refused to authorize or permit the development of any multiple-family dwellings within the boundaries of the town. A few older apartment buildings were built prior to the enactment of the ordinance and exist as nonconforming uses.

"The present zoning ordinance, which was enacted in 1971 to replace a 1945 version, provides for 12 types of districts. Four districts are restricted to residential use based on minimum lot size. Districts R-2A and R-1A mandate two-acre and one-acre minimum lot sizes respectively, while the other two residential classes call for one-half and one-quarter acre lot development. Six districts are set aside for business development and another two are earmarked for industrial uses. However, in terms of surface area, most of the town is restricted to one- and two-acre residential development. In none of the 12 districts would the development of multiple-family dwellings be permitted.

"The plaintiffs, either individually or through corporations, had controlled or owned since 1955 a parcel of 50 acres situated on the southern end of New Castle. Their land fronts on Bedford Road to the west and Old Farm Road to the southwest and is zoned for one-acre residences. Indeed, the plaintiffs originally owned more land in the same parcel but subdivided it and constructed one-family houses, in conformity with existing zoning requirements. The properties adjoining the plaintiff's parcel on the west and east are zoned for one-half acre development. The property on the northern boundary is set aside for one-quarter acre lots. Just beyond the one-half acre zone to the west of the plaintiffs' property lies a relatively large retail, commercial and industrial zone.

"In early 1972, the plaintiffs planned the construction of a large condominium development on their remaining property. The proposed improvements would include public water and sanitary sewers, a five-acre lake, and a recreational area [including swimming pools and tennis courts] of seven or eight acres. The condominium's community would be age-oriented and, with respect to married couples, either the husband or the wife would have to be at least 50 years of age. Mitchell Berenson, one of the plaintiffs, was informed by town officials that the requested zoning changes would not be made. Thereupon, this action was brought to declare the town's zoning ordinance unconstitutional."

On that prior appeal, the Court of Appeals comprehensively summarized the controlling law and formulated the factual issues which remained to be tried in this case as follows (38 NY2d, at pp 107-111):

"The Legislature has authorized town zoning boards, '[f]or the purpose of promoting the health, safety, morals, or the general welfare of the community,' to adopt zoning ordinances regulating and restricting, among other things, 'the height, number of stories and size of buildings and other structures,' the size of building lots, and the over-all population density. (Town Law, § 261.) Zoning ordinances are susceptible to constitutional challenge only if 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' (*Euclid v Ambler Co.,* 272 US 365, 395; *Matter of Diocese of Rochester v Planning Bd. of Town of Brighton,* 1 NY2d 508, 522.) Thus, it necessarily follows that the validity of a zoning ordinance depends on the facts of the particular case and whether it is

'really designed to accomplish a legitimate public purpose.' *(Matter of Wulfsohn v Burden,* 241 NY 288, 299.) * * *

"In determining the validity of an ordinance excluding multi-family housing as a permitted use, we must consider the general purposes which the concept of zoning seeks to serve. The primary goal of a zoning ordinance must be to provide for the development of a balanced, cohesive community which will make efficient use of the town's available land. (Cf. *Matter of Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359, 378, app dsmd 409 US 1003, *supra.)* By balanced, we do not mean to imply that a community must maintain a certain quantitative proportion between various types of development. Clearly, such a requirement would rub against one of the basic purposes of zoning, which is to provide in an orderly fashion for actual public need for various types of residential, commercial and industrial structures. (See *Valley View Vil. v Proffett,* 221 F2d 412, 418, *supra.)*

"Similarly, the town is free to set up various types of use zones. There is no requirement that each zone must contain some sort of housing balance. Our concern is not whether the zones, in themselves, are balanced communities, but whether the town itself, as provided for by its zoning ordinances, will be a balanced and integrated community. Thus, as in the Scarsdale case, if a district is set aside for multiple-dwelling development, there is no requirement that other portions of a town contain such developments. *(Matter of Fox Meadow Estates v Culley,* 233 App Div 250, affd without opn 261 NY 506, *supra.)*

"While it may be impermissible in an undeveloped community to prevent entirely the construction of multiple-family residences anywhere in the locality (see *Dowsey v Village of Kensington,* 257 NY 221, *supra),* it is perfectly acceptable to limit new construction of such buildings where such units already exist. *(Matter of Fox Meadow Estates v Culley, supra.)*

*"The first branch of the test,* then, is simply whether the board has provided a properly balanced and well ordered plan for the community. (See *Udell v Haas,* 21 NY2d 463.) Of course, what may be appropriate for one community may differ substantially from what is appropriate for another.*

---

* "In a recent case, the United States Supreme Court ruled that a small village could permissibly restrict its entire land to use as one-family dwellings. *(Village of Belle Terre v Boraas,* 416 US 1.) Belle Terre, a small community of 220 homes and 700 inhabitants, might properly be considered a 'one zone' community. Obviously,

Thus, in this case, the court must ascertain what types of housing presently exist in New Castle, their quantity and quality, and whether this array adequately meets the present needs of the town. Also, it must be determined whether new construction is necessary to fulfill the future needs of New Castle residents, and if so, what forms the new developments ought to take.

"Secondly, in enacting a zoning ordinance, consideration must be given to regional needs and requirements. It may be true, for example, that New Castle already has a sufficient number of multiple-dwelling units to satisfy both its present and future populations. However, residents of Westchester County as well as the larger New York City metropolitan region, may be searching for multiple-family housing in the area to be near their employment or for a variety of other social and economic reasons. There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met. Although we are aware of the traditional view that zoning acts only upon the property lying within the zoning board's territorial limits, it must be recognized that zoning often has a substantial impact beyond the boundaries of the municipality.

"Thus, the court, in examining an ordinance, should take into consideration not only the general welfare of the residents of the zoning township, but should also consider the effect of the ordinance on the neighboring communities. While regional needs are a valid consideration in zoning, apart from any question as to the standing of persons outside the zoning jurisdiction to raise the issue, a town need not permit a use solely for the sake of the people of the region if regional needs are presently provided for in an adequate manner. Thus, for example, if New Castle's neighbors supply enough multiple-dwelling units or land to build such units to satisfy New Castle's need as well as their own, there would be no obligation on New Castle's part to provide more, assuming there is no overriding regional need. *The second branch of the test* is whether the town board, in excluding new multiple housing within its township, considered the needs of the region as well as the town for such housing. So long as the regional and local needs for such housing were supplied by either the local

New Castle, a town of over 17,000 people, would not be so small as to qualify as but one 'use' district. *(Dowsey v Village of Kensington,* 257 NY 221, *supra;* see *Levitt v Incorporated Vil. of Sands Point,* 6 NY2d 269, *supra.)*"

community or by other accessible areas in the community at large, it cannot be said, as a matter of law, that such an ordinance had no substantial relation to the public health, safety, morals or general welfare.

"Zoning, as we have previously noted, is essentially a legislative act. Thus, it is quite anomalous that a court should be required to perform the tasks of a regional planner. To that end, we look to the Legislature to make appropriate changes in order to foster the development of programs designed to achieve sound regional planning. While the people of New Castle may fervently desire to be left alone by the forces of change, the ultimate determination is not solely theirs. Whether New Castle should be permitted to exclude high density residential development depends on the facts and circumstances present in the town and the community at large. Until the day comes when regional, rather than local, governmental units can make such determinations, the courts must assess the reasonableness of what the locality has done. That is what remains to be considered upon the trial in this case." (Emphasis supplied.)

█ Special Term gave failing grades to the town on both branches of the test, finding first that the existing housing array does not satisfy the present needs of the town and, second, that there exists a regional need for multifamily housing which is not being met by either the Town of New Castle or its neighboring communities in northern Westchester County. That there does exist an unmet local and regional need for multifamily housing is not seriously contested by the town on appeal, and this finding is amply supported by the evidence. However, instead of merely declaring the ordinance unconstitutional and remanding the matter to the town board for passage of an amended zoning ordinance which would pass judicial muster, Special Term went further and awarded the plaintiffs comprehensive affirmative relief. Finding that the town had not merely "failed" to consider local and regional housing needs, but, on the contrary, had "continuously and actively opposed any planning or program that would suggest the assumption by it of any responsibility to meet local or regional housing needs", and that compliance with the standards for local government land use control would not be promoted if made to depend upon repetitive litigation of the basic substantive issues, Special Term promulgated "judicially established housing goals" by declaring that the construction

of 3,500 units of multifamily housing over the next 10 years was "the most conservative estimate of what will be required of New Castle * * * to supply its own needs * * * [and] its share of the regional needs", and directed the town to amend its zoning ordinance, land use regulations and planning policies to accommodate the needed housing. The town was given six months within which to comply,[1] and in the absence of timely and satisfactory compliance, Special Term decreed that the traditional presumption of validity attending zoning ordinances would be suspended and applications for rezoning would be granted on an *ad hoc* basis to individual developers whose proposals meet the judicially established housing goals, unless the town is able to establish compelling reasons for denial. Special Term also declared that the zoning ordinance was unconstitutional as it applied to the plaintiffs' property and directed the town to rezone that property for multifamily housing at a density of eight units per acre within six months. In its decision, Special Term stated that a building permit should be issued to the plaintiffs upon the advent of rezoning. To all of this broad, comprehensive relief the town objects, and rightfully so.

Historically, zoning in this country began in our larger cities, where unregulated land use policies had created a very real threat to the public health, safety and welfare (see, generally, Bassett, Zoning [1936], p 20 *et seq.*). Thereafter, the wealthier, developing suburbs seized upon the idea of comprehensive zoning as a means of regulating growth and preserving their particular "amenities" (see, e.g., *Matter of Fox Meadow Estates v Culley,* 233 App Div 250, affd 261 NY 506), and today, of course, its existence is widespread.

From the outset, zoning ordinances have been primarily concerned with controlling population density and protecting preferred uses, such as single-family residences, from other types of uses deemed less desirable or even harmful to residential living or environmental balance *(Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359 [dissenting opn by BREITEL, J., p 384], app dsmd 409 US 1003). The primary means employed to achieve this desired end has usually been the division of the municipality into various "use" districts, whose exclusionary character was sustained in principle at least as early as 1926 in *Euclid v Ambler Co.* (272 US 365) as

---

1. The effective date of the judgment was also deferred for six months following the date of entry.

serving the general welfare. One of the most common exclusionary restrictions in suburban communities was (and still is) that of barring apartment buildings from residential districts devoted to detached one- and two-family houses and, indeed, in the *Euclid* case, the United States Supreme Court cited, with apparent approval, comprehensive zoning studies indicating that apartment houses retarded and sometimes destroyed the viable development of detached-house neighborhoods, that an apartment house in such a neighborhood is often a "mere parasite" constructed to take advantage of the open spaces and attractive surroundings created by the district's residential character, and that the necessary accompaniments of increased traffic, business and noise often operated to deprive children of the quiet, safe and open play areas enjoyed by those in more "favored" localities. "Under these circumstances" the Supreme Court concluded, "apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances" *(Euclid v Ambler Co.,* 272 US 365, 394-395, *supra).* However, even then there were those who recognized and bemoaned the existence of a deeper, less benevolent purpose behind some restrictive zoning. Thus, in originally invalidating the *Euclid* ordinance at the trial level, the Federal District Court for the Northern District of Ohio (WESTENHAVER, J.), noted, *inter alia* (297 F 307, 316): "The plain truth is that the true object of the ordinance in question is to place all the property in an undeveloped area of 16 square miles in a straitjacket. The purpose to be accomplished is really to regulate the mode of living of persons who may hereafter inhabit it. In the last analysis, the result to be accomplished is to classify the population and segregate them according to their income or situation in life. The true reason why some persons live in a mansion and others in a shack, why some live in a single-family dwelling and others in a double-family dwelling, why some live in a two-family dwelling and others in an apartment, or why some live in a well-kept apartment and others in a tenement, is primarily economic. It is a matter of income and wealth, plus the labor and difficulty of procuring adequate domestic service."

As a general matter, at least in New York, ordinances restricting apartment houses or multifamily housing to one area or zone of a locality have been upheld (see, e.g., *Matter of*

*Fox Meadow Estates v Culley,* 233 App Div 250, affd 261 NY 506, *supra),* while ordinances barring them entirely have been invalidated (see, e.g., *Dowsey v Village of Kensington,* 257 NY 221). In all of these cases, however, only the competing interests of the general welfare of the particular community and that of the landowner desiring a more reasonable or profitable return on his property have been involved. Pressure for the relaxation of exclusionary restrictions on the part of those excluded did not then exist, and it was therefore in this context of competing *parochial* interests that the general rule against "judicial rezoning" developed. Zoning and land use regulations were deemed to be legislative functions, to be exercised by and within the particular expertise of the *local* legislative body. Thus, with the single exception of discriminatory zoning of similarly situated parcels, in which case the obvious remedy was to treat like parcels alike, a judicial declaration that a zoning ordinance was invalid as applied to a particular piece of property was never accompanied by a declaration which actually rezoned that property or placed it within a particular use classification (see, e.g., *Lusk v Town of Eastchester,* 60 AD2d 645; *Jurgens v Town of Huntington,* 53 AD2d 661; *Emjay Props. v Town of Brookhaven,* 42 AD2d 907).

More recently, however, court challenges to exclusionary zoning on behalf of those excluded from the community have come into being, spawned by tremendous economic and social changes and the deterioration of city life. These challenges have not been prompted by the mere growth of the suburbs as attractive, affluent, mainly white collar bedroom communities, for those have been with us for many years. Rather, the critical factor appears to have been the relatively recent flight of blue collar jobs to the suburbs, where housing for the employer, but not his employees, was willingly provided. Moreover, while the early judicial challenges to such exclusionary practices were brought by plaintiff developers who wished to put their property to a more profitable, higher density use, it was soon recognized that the developers' rights could not realistically be separated from the rights of others, then nonresidents, " 'in search of a comfortable place to live' " *(Concord Township Appeal,* 439 Pa 466, 474, n 6) and the cases were decided accordingly. In these cases, the relief sought was generally a declaration of the unconstitutionality of the zoning ordinance and the relief, when granted, consisted of such a declaration and, in some of cases, in a departure from past

practices, a direction, in effect, rezoning the plaintiff's land (*National Land & Inv. Co. v Easttown Township Bd. of Adj.,* 419 Pa 504 [striking down an ordinance requiring a four-acre minimum lot size in certain districts]; *Girsh Appeal,* 437 Pa 237 [striking down an ordinance making no provision for apartment houses except by way of a variance]; *Township of Willistown v Chesterdale Farms,* 462 Pa 445 [striking down an ordinance allowing apartment house construction on only 80 of the township's 11,589 acres as not providing a "fair share" of township acreage for apartment construction and directing that the plaintiff's land be rezoned for such use]; *Surrick v Zoning Hearing Bd. of Township of Upper Providence,* 476 Pa 182 [striking down as violative of the "fair share" doctrine, an ordinance limiting apartment house construction to 1.14% of the township's acreage, the same being in a substantially developed, essentially commercial district, and granting the plaintiff specific relief in the nature of a change of zone]). It should be emphasized, however, that the "fair share" standard adopted by the Pennsylvania Supreme Court in these cases was an amorphous concept, unrelated to any *specific* regional need or that of any of the neighboring communities, and was not intended to convert the court into a "super" board of adjustment. Moreover, in no case was a township directed to provide for any *specific amount* of higher density residential development, nor were any *specific number* of acres to be devoted to such usage.

While a large number of the earlier exclusionary zoning cases were decided in Pennsylvania, at the present time perhaps the single most advanced body of law on the subject has been developing in our sister State of New Jersey and, under these circumstances, it is appropriate if not essential that we examine the state of that law in passing upon the instant appeal. In *Southern Burlington County NAACP v Township of Mount Laurel* (67 NJ 151, app dsmd and cert den 423 US 808), the New Jersey Supreme Court was confronted with a zoning ordinance which permitted only one type of residential housing—single-family detached dwellings—in an entire township. Although the Township of Mount Laurel had previously allowed some multifamily housing by agreement in certain "planned unit developments", the underlying contractual agreements had sharply restricted the number of apartments having more than one bedroom. Moreover, while almost 30% of the township's land had been set aside for industrial

and related uses, only a minute portion of that acreage had actually been so developed.

The plaintiffs in *Mount Laurel,* low and moderate income former and present residents of the township, as well as nonresidents who desired to live there, claimed that they could not find decent housing in the township to meet their needs. The New Jersey Supreme Court held that, as a developing municipality, Mount Laurel had to make realistically possible, by its land use regulations, an appropriate variety of housing for all who might desire to live there, including those of low and moderate income, and, in pursuance of the foregoing, that it had to permit high density zoning and low cost housing, including multifamily housing and smaller, more affordable dwellings on smaller lots. In addition, the court held that until the adoption of some form of regional zoning, each municipality located within the region had to assume its own "fair share" of the regional moderate and low income housing burden. By way of a remedy, the court declared invalid so much of the zoning ordinance as, in effect, precluded low and moderate income housing, and gave the township 90 days within which to adopt amendments to correct the specific deficiencies. The details of the amendments were left to Mount Laurel, however, as they concerned matters of local responsibility in the first instance.

Later, in *Oakwood at Madison v Township of Madison* (72 NJ 481), the New Jersey Supreme Court refined the *Mount Laurel* "fair share" doctrine and laid down two key principles: (1) that it is not mandatory for a developing municipality or a trial court to (a) designate the specific "region" whose needs are to be measured, or (b) fix a specific unit goal as that municipality's "fair share" of the regional housing needs; and (2) that to the extent that a municipality's "fair share" of the regional need for low income housing cannot be provided through public subsidies or legislative incentives, the municipality must amend its zoning regulations to render feasible the "least cost" housing, consistent with minimum standards of health and safety, which private industry will undertake in amounts sufficient to satisfy the balance of its hypothesized "fair share". As respects a "fair share" unit goal in particular, the court held that numerical housing quotas, such as requiring a municipality to provide 5,000 units of low income housing, were not realistically translatable into specific substantive zoning amendments, as there are too many other

variables which affect the actual production of housing attendant a given zoning change. Municipalities, it was noted, have no duty to build or subsidize low income housing. Significantly, the court also found that "the breadth of [the] approach by the experts * * * to the criteria for [allocating] * * * regional housing goals to municipal 'subregions' is so great and the pertinent economic and sociological considerations so diverse as to preclude judicial dictation or acceptance of any one solution as authoritative" *(Oakwood at Madison v Township of Madison, supra,* p 499). Solution of these complex governmental, sociological and economic problems was seen as "much more appropriately a legislative and administrative function rather than a judicial function to be exercised in the disposition of isolated cases" *(supra,* p 534).

Nevertheless, because the New Jersey Supreme Court in *Oakwood* was reviewing the Madison ordinance after two trials and an interim amendment of the ordinance, it rejected any remedy which would have required another generalized remand for another unsupervised effort by the township to remedy the deficiencies in its ordinance, and ordered the trial court to make findings of fact as to any environmentally sensitive land unsuited for high density development. Then, if the specified deficiencies were not remedied by the township in a second amended ordinance, it directed the trial court to appoint an impartial expert to recommend a means of compliance. In addition, although the corporate plaintiff developers in *Oakwood* had not established that the ordinance was confiscatory as applied to their particular parcel, they were nevertheless granted specific relief, in the nature of conditional rezoning, in the interests of justice.

As a postscript to this analysis of New Jersey law, it should be noted that the amended ordinance which was enacted in *Mount Laurel* after the New Jersey Supreme Court's decision has been sustained, in large part, by the trial court as against a challenge that it is still far too exclusionary. In particular, it appears that the township's proposed "fair share" figure was accepted by the court even though plaintiffs' proposed figure was seven times larger and that, while the vast majority of new housing units planned for the township qualified as "least cost" housing, when finally built, they were unlikely to qualify as low or moderate income housing (Superior Ct of NJ, July 7, 1978, WOOD, J., Docket No. L-25741 PW).

Turning back now to the case at bar, Special Term found,

on the basis of the evidence adduced at the trial, that "the most conservative estimate of what will be required of New Castle over the next ten years to supply its own needs for multi-family housing and to meet its share of the regional needs for such housing is not less than 3,500 multi-family housing units", a figure which the court determined was not speculative, but rather "a realistic planning goal that recognized the minimum needs established by the evidence". As previously noted, since it deemed the town to be resistant to the voluntary assumption of its responsibilities in this respect and considered a one-time detailed mandate of specified changes in the zoning ordinance to be superior to expensive and repetitive litigation to achieve zoning relief on a parcel by parcel basis, Special Term simply directed the town to amend its ordinance and accessory regulations to provide for the construction of at least 3,500 units of multifamily housing by the end of 1987. In our opinion, this mandate is unsupported by the evidence, contrary to law, and contrary to sound principles of planning.

As respects the evidence adduced at the trial, it is readily apparent that this case contains a most peculiar incongruity. Although the amended complaint does not challenge the town's ordinance as exclusionary with respect to low and moderate income housing (which, in fact, it certainly is), and plaintiffs themselves do not purport either to represent low and moderate income persons seeking housing within the town or to be interested in building multifamily housing affordable by such persons, evidence as to the housing needs of this particular income group (persons having an annual income of less than $10,000 in 1970, which, by reason of inflation, translates into $14,613 in 1977) abounds in the record. Indeed, evidence as to the present housing needs of the town's residents and workers was quantified only as to this income group, although evidence as to regional housing needs was introduced both as to this lower income group and the population in general. As for the number of units it ordered to be provided, Special Term did not ascribe its 3,500 figure to any particular evidence or expert witness, but it is clear from the record that it was taken from the testimony of two particular experts, Levy and Raymond. Although one witness worked forward and the other backward, both estimated a "fair share" for the town to be about 3,500 units, based on a projected growth of the population of Westchester County, the

number of housing units required to be constructed to keep pace with such growth, and New Castle's fair share of such units, figured on the basis of its percentage of the remaining land in the county suitable for such development. *However, neither estimate was geared to the needs of lower income groups in particular.* In fact, Levy's "target figure" was not meant to include only multifamily units, while Raymound admitted that it was preferable to satisfy present needs first, as future needs might change during the period between the advent of rezoning and completion of the finished units.

There was also evidence in the case (not relied on by Levy or Raymond) that the Tri-State Regional Planning Commission had estimated a housing deficit, based on the 1970 census, of over 2,000,000 units in the Tri-State region, over 60,000 units in Westchester County, and about 6,000 units in the *13* communities of northern Westchester, of which New Castle is a part. These figures *were* based exclusively on the needs of families earning less than $10,000 in 1970 and took into account those units necessary to replace housing which was presently substandard, overcrowded (more than 1.01 persons per room) or cost-imbalanced (rent being 25% or more of the family's income), as well as new units which would be necessary for those who wished to reside closer to their employment. However, the figures themselves are inherently inflated, as the categories of substandard, overcrowded and cost-imbalanced housing often overlap; they do not distinguish between single- and multifamily dwellings; and, more importantly, the appropriate remedy for the problem described is not necessarily the construction of new housing, since the emphasis today is on the rehabilitation of existing units and on rent subsidies. Moreover, the data is now more than eight years old, and the estimated shortfall of 6,000 units was calculated with reference to all 13 communities of northern Westchester, most of which have similarly made little or no provision for multifamily or "least-cost" housing, but have not been joined as defendants in this action (cf. *Urban League of Greater New Brunswick v Mayor & Council of Borough of Carteret,* 142 NJ Super 11).

In point of fact then, the multifamily housing quota of 3,500 units, adopted by Special Term as New Castle's "fair share" of regional housing needs is a highly abstract and speculative number, to which the trial court ultimately gave more weight than did its proponents, Levy and Raymond. Further, the

court apparently failed to appreciate that the figure itself was referable to the housing market in general, both as to income groups and the type of housing (single- or multifamily) to be provided, and was not directly referable to the needs of the low income groups with which the court was primarily concerned. *The use of a "fair share" goal has never been judicially approved in the context of the housing needs of the population at large.* Its *raison d'etre* lies in the housing needs of the low and moderate income groups whose "circumstances of * * * economic helplessness * * * to find adequate housing * * * [combined with] the wantonness of foreclosing them therefrom by [exclusionary] zoning", impelled the New Jersey Supreme Court to adopt the "fair share" doctrine in the first instance *(Pascack Assn. v Mayor & Council of Township of Washington,* 74 NJ 470, 480). Moreover, Special Term's judgment cannot and does not insure that any of the multifamily units to be constructed will be anything other than luxury condominiums, with which the market may already be saturated. Finally, while not sufficient to save the ordinance from invalidation, the town's contention that multifamily rental housing (the type most affordable by persons of low and moderate income) cannot be constructed today even *with* governmental subsidies unless the land is publicly owned or figured at zero cost is not without some merit, especially if we are talking about providing lower income housing in sizeable quantities. Indeed, the New Jersey Supreme Court's subsequent focus upon "least-cost" housing, as opposed to *low-income* housing is attributable to its recognition that it will be virtually impossible to provide large amounts of newly constructed housing for the economically less fortunate in the foreseeable future *(Oakwood at Madision v Township of Madison,* 72 NJ 481, *supra).*

Aside from these evidentiary and practical problems, it is also abundantly clear that Special Term's declaration of a specific, mandatory "fair share" quota for the Town of New Castle is unsupported by case law and contrary to the public policy considerations embodied therein. It will be recalled that the "fair share" doctrine in Pennsylvania never encompassed the judicial specification of a particular number of higher density units to be built or the acreage to be devoted to such usage, and that even in New Jersey, where the doctrine is most highly developed, the Supreme Court has thus far refused to require judicial prescription of a mandatory "fair

share" unit quota, concluding in essence, that such a course would be both inappropriate and impracticable. Nor is the decision of the Court of Appeals on the prior *Berenson* appeal (38 NY2d 102, *supra)* authority for the adoption of a "fair share" unit quota. Quite to the contrary, in holding that New Castle could validly exclude multifamily housing if its neighboring communities provided a sufficient number of such units, or the land upon which they could be built, to satisfy their own, New Castle's, and the regional needs, the Court of Appeals impliedly held that New Castle per se did not have to bear any "fair share" of any such housing burden. On the other hand, however, we cannot be blind to the fact that were the regional and local needs already being satisfied elsewhere, it is unlikely that we would be presented with the instant lawsuit, as the desire of developers and builders such as the plaintiffs to maximize their profits through more intensive land usage is, after all, dependent upon a market demand for that type of development. In any event, by holding that the courts had no choice, in the absence of meaningful regional planning, but to "assess the reasonableness of what the locality has done" *(Berenson v Town of New Castle,* 38 NY2d 102, 111, *supra),* the Court of Appeals in our view, merely intended to have Special Term determine whether New Castle's exclusion of multifamily dwellings was reasonable in light of present and foreseeable local and regional needs. We do not perceive that the court intended that a finding of unreasonableness, i.e., that there was an *unmet* local or regional need for multifamily housing which the town had ignored by excluding such housing, would authorize the court to go even further and remedy the deficiency by specific judicial fiat.

Although we therefore find that Special Term erred in mandating a "fair share" unit goal, there is little doubt but that the record establishes an unsatisfied local and regional need for multifamily housing on the part of what we shall simply call the less affluent residents of the New York City metropolitan area. Indeed, the town does not argue to the contrary. And while multifamily zoning cannot insure that such units will actually be built, or that, if built, they will be affordable by families of modest means, the absence of such zoning, as noted by Special Term, surely precludes any such construction.

As a court of law, we cannot provide any lasting solution for the complex problems posed by cases such as this, but we can

and must in appropriate cases require a developing municipality such as the Town of New Castle to cease its policy of immunizing itself from the ordinary incidents of growth and "confront the challenge of population growth with open doors" (*Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359, 379, *supra*). The zoning ordinance thus having been properly declared unconstitutional for failure to make adequate provision for multifamily housing, the judgment should be modified so as to delete the 3,500 unit requirement, but direct that the matter be remanded to the town board to remedy its zoning deficiency within six months. Further, Special Term should retain jurisdiction for the purpose of allowing the plaintiffs to challenge the sufficiency of any amended ordinance by supplemental pleadings in this case. It is our expectation that the town will now set about its task with the utmost good faith. However, we feel compelled to note that the interim amendment here, characterized by one of plaintiffs' witnesses as having been drawn with such care as might be exercised if the town had to accept a leper colony into its midst, was not such a good-faith effort. Allegedly designed to provide 100 to 150 units of multifamily housing in the central business district of Chappaqua (an inadequate number in any event), plaintiffs presented uncontroverted proof that this estimated yield was based solely on spatial capacity and, as a general matter, could not be realized without the conversion of existing commercial space into residential space or the construction of a second floor on the tops of one-story commercial buildings, there being so little vacant land left to develop; as a practical matter, it was stated, the construction of no more than 27 units was realistically possible.[2]

There remains to be considered the problem of plaintiffs' own land. Under the special circumstances of this case, including the fact that a valid amended ordinance might not designate plaintiffs' property for multifamily development although it is (as Special Term found) well suited therefor (see *Berenson v Town of New Castle,* 38 NY2d 102, 106, *supra)*[3] and that an

---

2. We can only caution the town at this juncture that a lack of good faith may call for sterner measures (cf. *Oakwood at Madison v Township of Madison,* 72 NJ 481, *supra*).

3. It should be emphasized at this juncture that plaintiffs' property (presently situated in a one-acre residential zone) has been established on this record to be well suited for multifamily development and is located on the southern end of New Castle, bounded by half-acre residential zoning to the east and west and quarter-acre residential zoning to the north. (Quarter-acre residential zoning is New Castle's least

award of affirmative relief will go a long way toward actually providing some additional multifamily housing in the foreseeable future (see *Oakwood at Madision v Township of Madison,* 72 NJ 481, *supra),* we believe that Special Term properly directed the town to rezone plaintiffs' land for multifamily use. However, Special Term erred in additionally mandating (1) a specific allowable density of development (actually twice that proposed by plaintiffs), and (2) the issuance of a building permit to plaintiffs upon their compliance with the amended zoning regulations. The question of the density of development is an issue which should properly be considered by the town board in the course of amending the ordinance in conformity herewith. As for the issuance of a building permit, we trust that to whatever extent plaintiffs' proposals may necessitate approval pursuant to the Freshwater Wetlands Act, they will secure such approval prior to being granted any building permit (see ECL, art 24).

The judgment appealed from should, therefore, be modified so as to delete the third, fourth, fifth and sixth decretal paragraphs and to substitute in their stead provisions to the effect that (1) the matter be remanded to the town board for correction of the specified deficiency in the zoning ordinance within six months' time, (2) the town be directed to rezone plaintiffs' property for multifamily use and (3) Special Term shall retain jurisdiction for the purpose of allowing the plaintiffs to challenge the sufficiency and validity of any amended ordinance by supplemental pleadings in this case. As so modified, the judgment should be affirmed with costs against the defendant-appellant.

SHAPIRO, J. (concurring in part and dissenting in part). With one exception, I concur in the scholarly and comprehensive opinion of my brother Mr. Justice GULOTTA.

The amended zoning ordinance enacted by the Town of New Castle in response to the caveat of *Berenson v Town of New Castle* (38 NY2d 102) was a derisive mockery, verging on contempt. As Mr. Justice GULOTTA clearly states, the amended ordinance which purports "to provide 100 to 150 units of multifamily housing in the central business district of Chappaqua * * * was based solely on spatial capacity and, as a general matter, could not be realized without the conversion

restrictive form of residential zoning at the present.) Moreover, a relatively large retail, commercial and industrial district lies just beyond the one-half acre residential zone located to the west of plaintiffs' parcel.

of existing commercial space into residential space or the construction of a second floor on the tops of one-story commercial buildings, there being so little vacant land left to develop". He then properly points out that under those circumstances "the construction of no more than 27 new units was realistically possible."

While he then cautions the town that "at this juncture * * * a lack of good faith" in enacting a proper ordinance "may call for sterner measures", he nevertheless gives it six months more "to remedy its zoning deficiency". Thus, the town is gaining additional time in its struggle for exclusiveness. I do not believe it is entitled to such a bonus. Such an extension of time to enact a proper ordinance can only constitute a signal to other municipalities to do likewise, so that if they cannot have segregation forever they will at least have it for many tomorrows.

In a case such as this where the dilatory tactics of the town have prevented the plaintiffs from proceeding with their building project for more than five years, two strikes should be out. The conduct of the town fathers exhibits a flagrant and intentional and malicious policy of disregard for the law which was clearly intended to impede, if not entirely defeat, the rights of the plaintiffs. Thus, the zoning ordinance should be declared invalid with no period of grace. If there is no zoning until the town fathers shoulder their proper responsibilities—so be it. They should not be given leisure time to reform. Enough is enough.

MOLLEN, P. J., HOPKINS and MARTUSCELLO, JJ., concur with GULOTTA, J.; SHAPIRO, J., concurs in part and dissents in part, with an opinion.

Judgment of the Supreme Court, Westchester County, entered December 30, 1977, modified, on the law, by deleting the third, fourth, fifth and sixth decretal paragraphs thereof and substituting therefor provisions (1) remanding the matter to the town board to remedy its zoning deficiency within a period of six months, (2) directing the town board to rezone plaintiffs' property for multifamily use and (3) directing that Special Term retain jurisdiction for the purpose of allowing plaintiffs to challenge the sufficiency and validity of any amended ordinance by supplemental pleadings in this case. As so modified, judgment affirmed, with costs to respondents payable by appellant.