ASIAN AMERICANS FOR EQUALITY et al., Respondents, v EDWARD KOCH, as Mayor of the City of New York and Chairman of the Board of Estimate, et al., Appellants.

First Department, May 5, 1987

## APPEARANCES OF COUNSEL

*Stephen Dobkin* of counsel *(Frank Barbaro, Richard Sussman* and *Ann Detiere* with him on the brief; *Earle R. Tockman* and *Geoffrey D.H. Smith,* attorneys), for respondents.

*Edward F.X. Hart* of counsel *(Larry A. Sonnenshein* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for Edward Koch and others, appellants.

*Ronald J. Offenkrantz* of counsel *(Spitzer & Feldman, P. C.,* attorneys), for Henry Street Partners, defendant.

*Henry A. Hill, Jr.,* of counsel *(Thomas Jay Hall* with him on the brief; *Brener, Wallack & Hill,* attorneys), for American Planning Association, *amicus curiae.*

*Leslie Salzman* and *Andrew Scherer* of counsel *(Renee Steinhagen, Roger Wareham, Diane Yee, Kathy Hecht* and *Roland Lewis* with them on the brief; *New York Lawyers for the Public Interest and Community Action for Legal Services,* attorneys), for Ansonia Tenants Coalition, Inc., and others, *amici curiae.*

*Daniel J. Popeo* of counsel *(Gerald J. Popeo* and *George C. Smith,* attorneys), for Washington Legal Foundation, *amicus curiae.*

*Alan Rosner, Helen Hershkoff* and *Scott A. Rosenberg* of counsel *(Kalman Finkel,* as Attorney-in-Charge, *Helaine Barnett,* as Project Director, *Arthur J. Fried,* as Supervising Attorney, and *John E. Kirklin,* as Director of Litigation), for The Legal Aid Society of New York, *amicus curiae* on behalf of the Homeless Family Rights Project.

## OPINION OF THE COURT

Ross, J.

In this matter we are presented with the issue of whether the City of New York properly exercised its zoning power in creating the Special Manhattan Bridge District, which is located in the Chinatown area, in view of the allegation that

the city did not affirmatively order the construction of dwelling units for low- and moderate-income persons.

Since New York City is a political subdivision of the State of New York, it only possesses those governmental powers delegated to it by the State (NY Const, art IX, §§ 1, 2). Zoning is one of these delegated powers, and the city "must find its source in [an] enabling act of the Legislature" *(Matter of Barker v Switzer,* 209 App Div 151, 153 [1924], *appeal dismissed* 238 NY 624 [1924]).

New York State General City Law § 20 (24) and (25), set forth the permissible objectives of the zoning power of cities, outlines the types of regulation which may be promulgated, and imposes some specific limitations on the exercise of the power. Incidentally, "[t]he first zoning ordinance in the United States was the Zoning Resolution of the City of New York adopted in July 1916" (1 Rathkopf, Zoning and Planning § 1.01, at 1-6 [4th ed 1984]). This first zoning ordinance resulted from an intensive six-year study, and was intended to, *inter alia,* insure the public health and safety by a planned development of the City of New York (1 Metzenbaum, Zoning, at 7 [2d ed 1955]).

Chief Judge Cardozo observed in a concurring opinion in *Adler v Deegan* (251 NY 467, 485 [1929], *remittitur amended* 252 NY 615 [1930]), "[a] zoning resolution in many of its features is distinctively a city affair, a concern of the locality, affecting, as it does, the density of population, the growth of city life, and the course of city values".

A zoning ordinance, like any other legislative enactment, is "invested with an exceedingly strong presumption of constitutionality" *(Town of Huntington v Park Shore Country Day Camp,* 47 NY2d 61, 65 [1979]).

The Court of Appeals held in *Rodgers v Village of Tarrytown* (302 NY 115, 121 [1951]) that: "[the] decision as to how a community shall be zoned or rezoned, as to how various properties shall be classified or reclassified, rests with the local legislative body; its judgment and determination will be conclusive, beyond interference from the courts, unless shown to be arbitrary, and the burden of establishing such arbitrariness is imposed upon him who asserts it. In that connection, we recently said *(Shepard* v. *Village of Skaneateles,* 300 NY 115, 118): 'Upon parties who attack an ordinance * * * rests the burden of showing that the regulation assailed is not justified under the police power of the state by any reasonable

interpretation of the facts' ". The continuing vitality of the decision in *Rodgers v Village of Tarrytown (supra)* is evidenced by its citation as authority by a 1984 unanimous opinion of the Court of Appeals *(Cummings v Town Bd.* (62 NY2d 833, 834 [1984]).

The New York City Planning Commission (Planning Commission), in September 1979, published the Manhattan Bridge Area Study. This study was based upon a detailed examination of the Chinatown area of Manhattan. Due to the specialized character of Chinatown, the study had been conducted from the point of view of land use planning, and it concentrated on the commercial and residential needs of that area.

The Chairman of the Planning Commission and Director of City Planning (Chairman), in an affidavit, dated November 1, 1983, which appears in the record before this court, states, in pertinent part:

"The study found that with a continuing influx of Chinese immigrants, the old tenements of Chinatown were severely overcrowded. Because of the concentration of attached tenement housing, open space in Chinatown was found to be almost nonexistent * * *

"The study also discovered that there was little new construction of housing within Chinatown. A major reason for this lack of new construction was that the existing density of Chinatown tenements was substantially higher than the density permitted under the existing zoning regulations. Consequently, any new construction which would replace obsolete old tenements could not provide an equal number of dwelling units".

In response to the study's findings of a critical housing shortage in Chinatown, the Planning Commission proposed zoning amendments, which, if adopted, would result in the creation of a Special District (District) within the Manhattan Bridge area.

Before the Planning Commission made this proposal for the establishment of the District, extensive research and analysis had been undertaken by the Department of City Planning of the City of New York, in conjunction with urban planners, architects, and engineers. We note the amount of expert assisted planning that went into developing the Planning Commission's proposal, since the use by a planning agency of expert assistance is evidence that a proposed zoning change "was the result of comprehensive planning" *(Goodrich v Town of Southampton,* 39 NY2d 1008, 1009 [1976]).

This proposed District consisted of an area 14 to 20 blocks in size. In substance, the District was generally bounded west of the Manhattan Bridge by Monroe and Madison Streets, St. James Place, Oliver Street and the Manhattan Bridge, and bounded east of the Manhattan Bridge by Henry, Pike and Canal Streets, and the Manhattan Bridge. However, the area south of Monroe and Madison Streets and west of St. James Place was not included, since that area is presently developed with public or publicly assisted housing. Moreover, the area north of Henry Street and west of the Manhattan Bridge was also not included in the District, in view of the fact that it is an area of commercial development. We note from our examination of the map of the District, which is contained in the record, that Pike and Canal Streets are major avenues and form a natural district boundary.

The Planning Commission's proposal to establish the District includes regulations for its administration. These District regulations were tailored to accomplish such goals as preserving the residential character of the Chinatown community, permitting new construction within the area which is sensitive to the existing urban design character of the neighborhood, providing an incentive for a mixture of income groups, encouraging development of new community facility space, promoting the rehabilitation of the existing older housing stock in the area, causing minimal residential relocation, and facilitating housing accommodations for residents close to their places of employment in Chinatown.

Furthermore, the Chairman of the Planning Commission, in his affidavit mentioned *supra,* stated:

"[S]ignificantly, the District regulations are designed to result in a balance of income groups into the Chinatown community * * * In drafting the District regulations, the City Planning Commission believed it important to provide a wide range of housing opportunities within the area, so as to encourage the retention of moderate and upper income residents. The presence of these residents would further economic integration of the neighborhood, and would benefit all sectors of the community * * *

"At the same time, the * * * Planning Commission recognized that the majority of the area residents are low income people, and realized that the wholesale redevelopment of the area's housing stock would deprive these people of the limited housing opportunities still available to them. Therefore, the

District regulations were drafted to provide for development that is infill in nature; that is, limited to vacant or substantially vacant sites, rather than redevelopment-oriented".

Further, the District regulations particularly insured that housing construction, which involved greater density than was usually allowable, proceeded in a controlled fashion, which would be responsive to community needs. The mechanism in the regulations that provided the required control was the discretionary power to issue special permits, which to become effective needed the approval of the Planning Commission, as well as the Board of Estimate. Pursuant to the terms of the regulations, in order to qualify for a special permit, an applicant had to demonstrate to the Planning Commission that certain specified conditions, which were spelled out in the regulations, and which will be discussed *infra*, had been satisfied.

Before taking formal action on the District proposal and its regulations, the Planning Commission held a public hearing on June 3, 1981. Representatives of local community groups from the District, among others, participated in that public hearing, and they expressed support for the creation of the District. Incidentally, our review of the record indicates that no one appeared at that public hearing in opposition to the proposal.

Thereafter, on June 22, 1981, the Planning Commission adopted resolutions: (1) to amend the 1961 New York City Zoning Resolution (Zoning Resolution) to establish the District; and (2) to amend the zoning map to reflect the District boundaries, which were discussed *supra*. Our examination of the subject amendment to the Zoning Resolution indicates the District had been named the Special Manhattan Bridge District (SMBD), and the proposed regulations of the District, discussed *supra*, were a part of the adopted amendment (note: since the District regulations are part of the amendment, discussed *supra*, these regulations will henceforth be referred to as District amendments).

Following the Planning Commission's favorable action, the question of whether to create the District was referred for consideration to the Board of Estimate, pursuant to section 200 (a) (2) of the New York City Charter (Charter), which grants the Board the power to approve, disapprove, or modify the amendments.

After notice of hearing, pursuant to section 197-c of the

Charter, a public hearing was conducted by the Board of Estimate, and, on August 20, 1981, the Board of Estimate approved the subject amendments to the Zoning Resolution and to the zoning map.

Several key District zoning amendments permit an increase, within the district, in the basic floor area ratio (F.A.R.) from 3.4 to a maximum of 7.5 (see, SMBD zoning amendments 116-10, 116-11, 116-12, 116-21). The F.A.R. expresses the relationship between the amount of floor area allowed in a building and the area of the lot on which the building stands. Thus, developers, who construct new housing in the District, may be allowed pursuant to special permit, to increase the amount of the permissible F.A.R., if they in turn provide any one, or a combination, of the following three bonus amenities to the community: (1) space for community facilities, which the amendments define as senior citizens centers, day care facilities, educational facilities, or a combination of them; (2) dwelling units for low- and moderate-income families; and (3) rehabilitation of existing substandard housing (see, SMBD zoning amendments 116-01, 116-11, 116-12, 116-20, 116-21).

In order to accommodate the increased floor area permitted by the aforecited provisions, SMBD zoning amendment 116.05 provides, in pertinent part, "the [Planning] Commission may waive the basic height and setback regulations for *those developments* which comply with [zoning amendment] 116-10 (Special Floor Area Bonus Provisions) and [zoning amendment] 116-20 (Special Floor Area Transfer Provisions), provided that the [Planning] Commission finds that the bulk of the *development* is distributed in such a way as to minimize any adverse effects of the additional bulk and to reinforce the existing neighborhood scale and character" (emphasis in text). Furthermore, to deal with this increased floor area, SMBD zoning amendment 116-04 provides, in pertinent part: "[T]he [Planning] Commission may [also] modify the basic lot area per room and open space ratio for those *developments* which comply with [zoning amendments] 116-10 * * * and 116-20 [subject to certain conditions]" (emphasis in text).

We note in passing that the District zoning amendments pertaining to the increased floor area preserve the residential character of Chinatown, while providing an incentive to developers to create new community facilities, low- and moderate-income housing, and the rehabilitation of older housing stock. The Court of Appeals held in *Udell v Haas* (21 NY2d 463, 469 [1968]) that:

"Underlying the entire concept of zoning is the assumption that zoning can be a vital tool for maintaining a civilized form of existence only if we employ the insights and the learning of the philosopher, the city planner, the economist, and sociologist, the public health expert and all the other professions concerned with urban problems * * *

"The almost universal statutory requirement that zoning conform to a 'well-considered plan' or 'comprehensive plan' is a reflection of that view * * * The thought behind the requirement is that consideration must be given to the needs of the community as a whole. *In exercising their zoning powers, the local authorities must act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives, and not because of the whims of either an articulate minority or even majority of the community"* (emphasis supplied).

Based upon the standards enunciated in *Udell v Haas (supra),* we find that these District zoning amendments, pertaining to increased floor area, are evidence that "forethought has been given to the [Chinatown] community's land use problems" *(see, Blumberg v City of Yonkers,* 41 AD2d 300, 305 [1973], *appeal dismissed* 32 NY2d 896 [1973]).

Under SMBD zoning amendment 116-50 (1), a developer's application for a special permit must "clearly * * * [indicate] that the site is vacant or *substantially vacant"* as of August 20, 1981, which, as mentioned *supra,* is the date that the Board of Estimate approved the amendment (emphasis in text). Moreover, SMBD zoning amendment 116-30 (a) and (c) require that, before tenants may be evicted from any building on a substantially vacant site, the applicant shall submit a tenant relocation plan to the New York City Department of Housing Preservation and Development and the affected community board, and such relocation plan shall include an affirmation that "no harassment of tenants has occurred"; and, that provisions have been made to relocate the "tenants in the Special Manhattan Bridge District to the extent possible".

The Henry Street Partners (HSP) applied to the Planning Commission in December 1981, for a special permit for development and construction of residential units on a site, now used as an open parking lot. The subject site is located at 60 Henry Street, which is within the District. The Planning Commission approved the special permit application of HSP

on August 30, 1982, and, thereafter, it was approved by the Board of Estimate on April 14, 1983.

In substance, HSP proposes to construct a 21-story residential building and community facility. When completed, this building will contain approximately 87 condominium units, containing 0 to 4 bedrooms, which will provide housing for upper-middle-income and professional residents of Chinatown, who might otherwise be forced to leave Chinatown, since it appears that there is virtually no housing presently existing in the area, which is available or suitable for their needs. Incidentally, it becomes obvious that the availability of these new apartment units will open up older housing now occupied by upper-middle-income people.

HSP proposes to construct and deed community facility space, including an indoor pool, to the YMCA. The YMCA programs will occupy 15,300 square feet on the ground floor and first cellar level of the building. Membership in the YMCA will be open to all residents of Chinatown or to any other person wishing to join, and the YMCA fees will be based upon the ability to pay. In addition, the project's plans provide for user access to these facilities by way of a street entrance, and this structural design should facilitate the community's participation in the YMCA. Further, it is anticipated that the YMCA, *inter alia,* will provide for adult education seminars, and a day care center, with various preschool programs.

In addition, the ground floor of the HSP apartment building will be partially occupied by private medical offices, which will increase the availability of medical care to the residents of Chinatown.

Moreover, HSP is obligated, if it constructs its project, to contribute $500,000 to subsidize or rehabilitate low-income housing.

Finally, HSP has entered into a restrictive declaration, which runs with the land and binds any subsequent owner of the site. The Chairman of the Planning Commission notes, in his affidavit mentioned *supra,* that, through the means of this restrictive declaration, "the City [of New York] and the residents of the neighborhood are assured that the Henry Street * * * project as approved will be built under specified restrictions".

Since 1981, when the District was established, three separate legal actions, including the instant one, have been brought primarily for the purpose of questioning the legality of the District's creation.

The first such action was commenced approximately four months after the Board of Estimate approved the establishment of the District. The title of and the citation to this action are: *Lai Chun Chan Jin v Board of Estimate* (115 Misc 2d 774 [Sup Ct, NY County 1982], *revd* 92 AD2d 218 [1st Dept 1983], *affd* 62 NY2d 900 [1984]). On December 21, 1981, the *Jin* petitioners instituted a proceeding, pursuant to CPLR article 78, seeking to annul the amendment to the Zoning Resolution that creates the District, the amendment to the zoning map which reflects the boundaries of the District, and the issuance of a special permit to the Overseas Chinese Development Corporation Inc. (OCD), which allowed OCD to construct a condominium in the District.

In substance, the *Jin* petitioners alleged in their petition that the Board of Estimate's approval of the amendment to the Zoning Resolution amendment to the zoning law, and the issuance of a special permit to OCD were void, since the *Jin* petitioners had allegedly not received adequate notice, in violation of their constitutional rights, of the public hearings held concerning the proposal to create the District. Particularly, the *Jin* petitioners attacked the notices of the public hearings held by Community Board No. 3 (CB3) and the Planning Commission.

Pursuant to the requirements of section 197-c of the Charter, a proposal of the Department of City Planning to create the District was submitted to the affected local Community Board, which was CB3, and to the Planning Commission for comments and suggestions. Following this submission of the Department of City Planning's proposal, the Planning Commission drafted amendments to the Zoning Resolution and to the zoning map to implement the proposal.

On January 30, 1981, OCD submitted an application to the Planning Commission for a special permit to construct a project in the proposed District.

Thereafter, on March 30, 1981, as required by the guidelines of the Uniform Land Use Review Procedure (ULURP), this proposed zoning map change and the OCD special permit application were certified as complete, and were forwarded to CB3 for its consideration. After publication of the proposed zoning map change and the OCD application for a special permit in the City Record and the Comprehensive City Planning Calendar, as mandated by the Guidelines of ULURP, CB3 held a public meeting on April 28, 1981. Following

discussion of these proposals, CB3 approved the zoning map amendment and the OCD special permit application by substantial margins.

Subsequently, as mentioned *supra,* on June 3, 1981 the Planning Commission held a public hearing concerning the proposal to create the District and related matters. Exactly as in the case of CB3 public hearing, mentioned *supra,* prior to the Planning Commission holding its June 3, 1981 public hearing, notice of it was published in the City Record and the Comprehensive City Planning Calendar, as required by the ULURP guidelines. Moreover, as mentioned *supra,* no one appeared in opposition at that hearing, and the Planning Commission adopted resolutions approving the zoning map change, the amendment to the Zoning Resolution and the OCD special permit.

In accordance with the statute, on June 26, 1981 the resolutions of the Planning Commission, which had been adopted on June 3, 1981, were filed with the Board of Estimate. Before taking formal action on those resolutions, as mentioned *supra,* the Board of Estimate held a public hearing, and notice of that hearing was published, as required by law. Finally, as mentioned *supra,* on August 20, 1981, after that public hearing, the Board of Estimate acted. In pertinent part, the Board of Estimate, on August 20, 1981, by separate resolutions, approved creation of the District, the zoning map change, and the granting of the special permit to OCD.

The city respondents contended that the actions the *Jin* petitioners sought to have annulled were allegedly legislative in nature, and, therefore, were not subject to review in an article 78 proceeding.

Special Term (115 Misc 2d 774, *supra)* agreed with the city respondents that the *Jin* petitioners had erred in using an article 78 proceeding to raise the issues, mentioned *supra.* However, Special Term held that, since all interested parties were before it, and the sole issue was petitioners' challenge on constitutional grounds to the alleged legislative action, it was, pursuant to CPLR 103 (c), going to treat the *Jin* petitioners' application as one for declaratory relief *(see, Matter of Kovarsky v Housing & Dev. Admin.,* 31 NY2d 184 [1972]). Finally, on the merits, Special Term granted the *Jin* petition. In its opinion, Special Term held, in substance, the publication of those notices in the English language in the City Record and Comprehensive City Planning Calendar were not reasonably

calculated to reach the members of the Chinatown community.

The city respondents appealed, and this court reversed Special Term *(Lai Chun Chan Jin v Board of Estimate,* 92 AD2d 218 [1st Dept 1983]). In our opinion, we found there was no violation of procedural due process, since the notices were published in publications authorized by statute, and, "[A]s a matter of observation by members of this bench, the general rule [is] that legal notices published in foreign language newspapers are published in the English language. Thus, the publication of a notice in English in a Chinese language newspaper would afford no greater notice than publication in the City Record and in the Comprehensive City Planning Calendar". *(Lai Chun Chan Jin v Board of Estimate, supra,* at 224). Further, we noted in our opinion "In respondents' brief and in the argument, we were informed that the special permit issued to OCD has since been revoked. In these circumstances, we think that a remand to the appropriate city authorities is called for so that they may give the situation such further consideration as they deem proper" *(Lai Chun Chan Jin v Board of Estimate, supra,* at 224-225). Finally, we declared, in our order reversing Special Term's judgment, that the creation of the District, and the amendments to the Zoning Resolution, and the zoning map are a constitutional and valid exercise of legislative power.

Thereafter, the *Jin* petitioners appealed to the Court of Appeals, and that court, unanimously, affirmed our reversal of Special Term, in that it held that the notice of the public hearings in connection with the proposal to create the District complied with the requirements of the law *(Lai Chun Chan Jin v Board of Estimate,* 62 NY2d 900, 902 [1984]). Furthermore, the Court of Appeals specifically found that the creation of the District resulted from a well-considered plan. In pertinent part, the Court of Appeals stated *(Lai Chun Chan Jin v Board of Estimate, supra,* at 902-903): "Petitioners also contend on this appeal that the zoning amendment is void because the Special Manhattan Bridge District was not adopted in conformance with a well-considered plan and they seek an evidentiary hearing to prove their contention. There is nothing in the record to establish that petitioners sought such relief in their petition or requested a hearing at Special Term, however, and they have thereby waived any right they may have had to a hearing (see *Telaro v Telaro,* 25 NY2d 433). *Moreover, the Manhattan Bridge Area Study,* published by the

City Planning Commission in 1979 and included in the record on this appeal, *reveals that the proposed revision and the effect it would have upon the health, safety and welfare of the affected community was considered before its adoption and that study fulfilled the requirement that the revision be adopted pursuant to a well-considered plan* (see *Albright v Town of Manlius,* 28 NY2d 108; *Udell v Haas,* 21 NY2d 463)" (emphasis supplied).

The second major legal action involving the District is *Chinese Staff & Workers Assn. v City of New York* (NYLJ, Jan. 23, 1985, at 12, col 1 [Sup Ct, NY County 1985], *affd* 111 AD2d 1081 [1st Dept 1985], *revd* 68 NY2d 359 [1986]). The *Chinese Staff* case, which is a combined article 78 proceeding and declaratory judgment action, challenges the issuance by the city respondents, in that action, of the special permit, mentioned *supra,* to HSP to construct a 21-story residential condominium, upon the grounds that the grant of the permit allegedly violated applicable environmental laws, does not comport with the District amendments, and was approved without adequate notice being given to the affected residents. By order, entered January 15, 1985, Special Term granted the motion of the city respondents-defendants to dismiss the petition and the causes of action.

Subsequently, the Court of Appeals reversed this court in the *Chinese Staff* case (68 NY2d 359 [1986], *supra).* Our examination of the majority opinion of the Court of Appeals indicates that this reversal was solely limited to annulling the special permit issued to HSP, mentioned *supra,* upon the ground that the city defendants in the *Chinese Staff* case failed to make an environmental analysis that took into consideration "the environmental effects required by the regulations" *(Chinese Staff & Workers Assn. v City of New York, supra,* at 361) promulgated by the City of New York, pursuant to Executive Order No. 91, dated August 24, 1977, entitled: "City Environmental Quality Review" (CEQR). In other words, nowhere in their opinion did the Court of Appeals discuss the primary issue in the instant case, as to whether the City of New York properly exercised its zoning power in creating the District, in view of the allegation by the plaintiffs in the instant case that the city did not affirmatively order the construction of dwelling units for low- and moderate-income persons, as same was not before it, and therefore not considered by the Court of Appeals in the *Chinese Staff* case. As we mentioned *supra,* and it is important that we reiterate, the

Court of Appeals, in unanimously affirming the *Jin* case, specifically stated, that the amendments creating the District were *"adopted pursuant to a well-considered plan* (see *Albright v Town of Manlius,* 28 NY2d 108; *Udell v Haas,* 21 NY2d 463)" (Lai Chun Chan Jin v Board of Estimate, supra,* 62 NY2d, at 903; emphasis supplied).

In the case at bar, the plaintiffs are Asian Americans For Equality (Asian), Tai Lui Chow (Mrs. Chow), Bo Lan Tom (Mrs. Tom), Karen Chan (Mrs. Chan), Pui Ying Wong (Mrs. Wong), individually and on behalf of all others similarly situated. These plaintiffs seek to maintain a class action constitutional challenge to the zoning amendments which created the District. In their four causes of action complaint, the plaintiffs allege, in substance, that the District amendments fail to provide a realistic opportunity for the creation of low-income housing, a standard enunciated by the New Jersey Supreme Court in *Southern Burlington County N.A.A.C.P. v Township of Mount Laurel* (92 NJ 158, 456 A2d 390 [1983]) and, therefore, constitutes exclusionary zoning. Furthermore, the plaintiffs also challenge in their complaint the grant of the special permit to HSP, and the potential tax abatement or exemption that might be afforded to HSP for its proposed project.

We find that the Court of Appeals reversal in the *Chinese Staff* case *(supra),* on the ground that the city did not correctly carry out the CEQR requirements in approving the HSP special permit, is not applicable to the instant case, in view of the fact that our examination of the allegations in the plaintiffs' complaint indicates that the plaintiffs do not contend that the zoning amendments creating the District are invalid, due to the alleged failure of the city defendants to consider the impact of the CEQR.

In pertinent part, the relief sought by plaintiffs is for a judgment declaring the amendments to the Zoning Resolution, which established the District, unconstitutional and void; revoking the special permit issued to defendant HSP which has already been accomplished, and, an injunction restraining defendant Tax Commission from approving any tax abatements, credits or other tax benefits to defendant HSP in connection with any development pursuant to the District zoning amendments, which is now moot. In response, the city defendants Board of Estimate, Planning Commission, and Tax Commission *et al.,* moved, pursuant to CPLR 3211 (a) (7), to dismiss the complaint for failure to state a cause of action.

While Special Term denied the motion of the city defendants to dismiss as to the first, second and third causes of action, which concern the amendment to the Zoning Resolution and the special permit issued to defendant HSP, it granted the motion of the city defendants to dismiss as to the fourth cause of action, which seeks to enjoin the approval of tax benefits to defendant HSP. However, Special Term did not deem the instant action a class action in its order, and plaintiffs have not filed a notice of appeal.

We find that Special Term erred insofar as it denied the city defendants' motion to dismiss the first and second causes of action, which deal with the creation of the District by the zoning amendments. The motion of the city defendants to dismiss the third cause of action which pertained to the HSP special permit, is moot, in view of the Court of Appeals action invalidating that permit on environmental grounds *(see, Chinese Staff & Workers Assn. v City of New York, supra).*

Approximately 60 years ago, the United States Supreme Court, in the landmark case of *Euclid v Ambler Co.* (272 US 365, 387-388 [1926]), stated: "The [zoning] ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions * * * Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality".

The primary purpose of zoning is to insure the orderly rather than the haphazard development of a community, so as to promote the community "health and the general welfare" *(Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville,* 51 NY2d 338, 343 [1980], *cert denied* 450 US 1042 [1981]).

As discussed *supra,* considering the exhaustive research and analysis that were expended by the Department of City Planning, in conjunction with the efforts of urban planners, architects, and engineers, to develop the District proposal, and, thereafter, the detailed scrutiny focused on the proposal, which included public hearings held by CB3, the Planning

Commission, and the Board of Estimate, we are not being presumptuous, when we conclude that it was hardly surprising that the Court of Appeals unanimously held the District zoning amendments were adopted "pursuant to a well-considered plan" *(Lai Chun Chan Jin v Board of Estimate, supra,* 62 NY2d, at 903).

We have carefully reviewed the complaint's allegations, and find that they have been artfully phrased in an effort to overcome the four-month Statute of Limitations contained in CPLR 217, which governs article 78 proceedings brought against a governmental body.

Since plaintiffs did not commence their instant action until September 12, 1983, more than four months had elapsed from the time, as mentioned *supra,* defendants Planning Commission and Board of Estimate adopted the District zoning amendments in 1981. My learned brother, Justice Carro, writing for a unanimous Bench, in earlier litigation concerning the District, quite properly held: "an action may not be labeled as one for a declaratory judgment merely to avoid the limitation imposed by CPLR 217 *(Solnick v Whalen,* 49 NY2d 224)" *(Lai Chun Chan Jin v Board of Estimate,* 101 AD2d 97, 99 [1st Dept 1984]).

Although it appears to us that plaintiffs are attempting to avoid the four-month Statute of Limitations, rather than dismissing the appeal on procedural grounds (which would be appropriate), we will determine this matter on the merits.

Special Term (129 Misc 2d 67) relied heavily on the legal authority of two New Jersey Supreme Court decisions, when it denied the city defendants' motion to dismiss the first cause of action, which alleges the District was not established as a result of a well-considered plan; and the second cause of action, which alleges the District zoning amendments fails to provide a realistic opportunity for the construction of low-income housing. *(Southern Burlington County N.A.A.C.P. v Township of Mount Laurel,* 67 NJ 151, 336 A2d 713 [1975], *cert denied and appeal dismissed* 423 US 808 [1975], which case is popularly referred to as *Mount Laurel I; Southern Burlington County N.A.A.C.P. v Township of Mount Laurel,* 92 NJ 158, 456 A2d 390 [1983], *supra,* which case is popularly referred to as *Mount Laurel II.)* Also, as mentioned *supra,* plaintiffs specifically cite *Mount Laurel II* in their complaint, in order to support their contention that the zoning amendments creating the District allegedly do not offer a realistic

opportunity for the creation of low-income housing, and, therefore, constitute exclusionary zoning.

Mount Laurel is a developing suburban township, which is located near Camden, New Jersey. It covers an area of 22 square miles, or about 14,000 acres.

In 1975, the New Jersey Supreme Court in *Mount Laurel I* held the township's zoning ordinance violated the due process and equal protection guarantees of that State's Constitution, since the ordinance had the practical effect of excluding low- and moderate-income persons from living in this suburban township. The court found that this exclusion resulted from the fact that most of the township's land was zoned for either single-family dwellings or for industrial use, which left very little opportunity for the construction of multifamily dwellings such as garden apartments, town or row houses, and mobile park homes. Moreover, the court's decision required developing New Jersey municipalities and/or townships, like Mount Laurel, to affirmatively use their land use regulations to provide a realistic opportunity for low- and moderate-income housing.

Thereafter, the court's dissatisfaction with the lack of encouragement given by Mount Laurel and other developing New Jersey municipalities to the construction of low- and moderate-income housing resulted in its 1983 decision in *Mount Laurel II.* The court in *Mount Laurel II* determined that, in order for developing New Jersey municipalities and/ or townships to fulfill their obligation to provide low- and moderate-income housing, they must encourage the construction of such housing through affirmative conduct, such as mandatory set asides, density bonuses, zoning for mobile homes, and tax incentives.

Although Special Term uses the holdings in the *Mount Laurel* cases, discussed *supra,* to justify its denial of city defendants' motion to dismiss the first two causes of action contained in the complaint, it concedes in its opinion that *Mount Laurel* is not the law in New York. We go further. Not by the widest stretch of the imagination, could the fact pattern in *Mount Laurel* be applicable to New York City's record for providing for low- and moderate-income housing.

Legal commentators have characterized the holdings in the *Mount Laurel* cases as "the most extreme treatment of the issue of exclusionary zoning in the country" (Rice, *Zoning and Land Use,* 37 Syracuse L Rev 747, 750 [1986]; *see also,* 2

Rathkopf, Zoning and Planning § 17.04, at 17-26, 17-27 [4th ed 1984]).

The *Mount Laurel* holdings have been specifically rejected at the appellate level in New York. In pertinent part, the Appellate Division, Second Judicial Department, in a unanimous decision, stated in *Suffolk Hous. Servs. v Town of Brookhaven* (109 AD2d 323, 331 [1985]), that: "[T]hese decisions *[Mount Laurel I and II]* go far beyond the law as declared by our own Court of Appeals, which has not, to this date, articulated any constitutional obligation on the part of our municipalities to zone for low-to-moderate-income housing".

Based upon our own review of New York case law, we join the court in *Suffolk Hous. Servs. v Town of Brookhaven (supra)* in refusing to adopt the *Mount Laurel* holdings, since we find the *Mount Laurel* holdings to be essentially a legislative judgment.

We carefully note that the *Mount Laurel* holdings are solely based upon an interpretation of the provisions of the law and Constitution of the State of New Jersey *(Mount Laurel I, supra,* 67 NJ, at 174-175; *Mount Laurel II, supra,* 92 NJ, at 208-209).

Since the 1983 decision in *Mount Laurel II (supra),* which set forth the New Jersey obligation of municipalities to zone to satisfy the housing needs of low- and moderate-income persons, "every [New Jersey] trial court decision * * * has recognized that the applicable housing region or regions [to which the *Mount Laurel* obligation applies] was larger than four counties" *(Morris County Fair Hous. Council v Boonton Twp.,* 209 NJ Super 393, 422, 507 A2d 768, 784 [1985]). Obviously, outside of major cities, areas "larger than four counties" usually contain significant areas of vacant land. However, the size of the District herein is not "larger than four counties", in fact, as conceded by the plaintiffs in their complaint, the District only "encompasses a 14-block area around the Manhattan Bridge on Henry and Market streets" and this 14-block area is one of the most densely populated areas in the country.

In the leading case of *Berenson v Town of New Castle* (38 NY2d 102, 110 [1975]), the Court of Appeals set forth a two-part test for courts to use to determine the validity of a zoning ordinance challenged as exclusionary, as follows:

"The first branch of the test, then, is simply whether the board has provided a properly balanced and well ordered plan

for the community * * * Of course, what may be appropriate for one community may differ substantially from what is appropriate for another * * *

"Secondly, in enacting a zoning ordinance, consideration must be given to regional needs and requirements".

Also, the Court of Appeals observed in its opinion in *Berenson v Town of New Castle (supra,* at 111): "Zoning * * * is essentially a legislative act. Thus, it is quite anomalous that a court should be required to perform the tasks of a regional planner. To that end, we look to the Legislature to make appropriate changes in order to foster the development of programs designed to achieve sound regional planning".

The Town of New Castle, whose zoning ordinance was under scrutiny in the case of *Berenson v Town of New Castle (supra),* is a suburban town, which was many times larger in area size than the instant District. In fact, plaintiffs concede, at page 19 of their respondents' memorandum, that the characteristics of Chinatown, which is in the inner-city, "are substantially different than in" suburban communities like Mount Laurel and New Castle. Our review of *Berenson v Town of New Castle (supra)* clearly indicates that, while the Court of Appeals invalidated a town ordinance for exclusionary zoning, it acknowledged that there is no requirement that every zone in the town "must contain some sort of housing balance. Our concern is not whether the zones, in themselves, are balanced communities, but whether the town itself, as provided for by its zoning ordinances, will be a balanced and integrated community" *(Berenson v Town of New Castle, supra,* at 109). Applying this standard to the City of New York, we find, while the New York City Zoning Resolution must provide for "a balanced and integrated community", not every amendment to that Zoning Resolution "must contain some sort of housing balance". Although the District is not required under the law of New York to contain a "housing balance", the amendments creating the District, as mentioned *supra,* provide incentives to developers, who qualify for special permits, to provide housing for low- and moderate-income persons.

With all due respect to our dissenting brother, he exceeds the bounds of fair discourse in arrogating unto himself a monopoly on compassion and conscience because he would "permit the community its day in court." He misperceives the judicial role. Our system of government is one based upon a separation of powers—the executive, the legislative, and the

judicial. It is not for us—as a court—to substitute our judgment for that of the Legislature in zoning matters *(see, Matter of Voelckers v Guelli,* 58 NY2d 170, 177 [1983]). Furthermore, as indicated *supra,* public hearings were held at every stage of the process leading to the adoption of the subject District zoning amendments, and the Court of Appeals has held that these amendments were adopted "pursuant to a well-considered plan" *(Lai Chun Chan Jin v Board of Estimate,* 62 NY2d 900, 903, *supra).*

The plaintiffs contend the District zoning amendments are allegedly not consistent with a well-considered plan, since such a plan must provide for the needs of the Chinese-American low-income community. We disagree, based upon our analysis *supra,* which indicates that the District zoning amendments were the product of a well-considered plan that took many factors into consideration, including the needs of the low-income residents of the area, and such plan was properly adopted.

Our examination of the District zoning amendments indicates that the housing needs of the low- and moderate-income population in the area have been specifically taken into account, since incentives are given to private developers, who create dwelling units for such persons *(see,* for example, SMBD zoning amendment 116-12, entitled: FLOOR AREA BONUS FOR THE PROVISIONS OF DWELLING UNITS FOR LOW & MODERATE INCOME FAMILIES).

In the "PRELIMINARY STATEMENT" to the complaint, the plaintiffs "claim that [the District] fails to provide a realistic opportunity for the construction of low income housing, as required by the State constitutional mandate that the zoning powers delegated by the State be exercised for the general welfare". We find that contention meritless.

The District herein consists of between 14 and 20 blocks, and the plaintiffs offer no legal authority that holds that every area as small as this District, which is zoned, must contain specific provisions for the construction of low- and moderate-income housing *(see in this connection, Berenson v Town of New Castle, supra,* at 110, n 2).

Furthermore, we find the applicable zoning district may very well be the entire City of New York, not a 14- to 20-block District, or even a borough, within the entire city. We note the fact that the District zoning amendments were made to the New York City Zoning Resolution. Moreover, we find, as

mentioned *supra,* no requirement under *Berenson v Town of New Castle (supra)* that each individual district or segment of a zoning jurisdiction provide for a balanced mix of housing.

Justice Carro in his dissent makes a number of references to the "dislocation of families and merchants". In the case before us, this is not an issue, since the proposed site consists of unimproved land, and, accordingly, there can be no "dislocation of families and merchants".

In summary, we find that the District zoning amendments are valid under the two-pronged test of *Berenson v Town of New Castle (supra);* and that the first two causes of action of the complaint fail to state a cause of action.

If the plaintiffs are inclined to continue to seek the relief request herein, they must seek same from the Legislature.

Accordingly, order, Supreme Court, New York County (David B. Saxe, J.), entered September 26, 1985, which, *inter alia,* denied the motion of the city defendants to dismiss the first and second causes of action of the complaint, should be modified, on the law and on the facts, to the extent of granting city defendants' motion to dismiss the first and second causes of action, and except as thus modified, otherwise affirmed, without costs.

CARRO, J. (dissenting). The rapidly diminishing supply over the last few years of available low- and moderate-income housing in New York City due to such factors as abandonment, demolition, conversion to other uses and decreases in subsidized housing programs has been well documented.[1] If left unhindered, the consequences of this process, particularly the potential for a frightening increase in the number of homeless families and the traumatic effects of displacement on families, are a cause for grave alarm to not only the individuals directly injured, but to society at large as the party which ultimately bears the burden of paying the price when the public welfare is endangered. It is no surprise, then, that the parties directly affected by a lack of adequate housing should seek redress of this problem through the State's exercise of that power which in the name of public welfare regulates the use of land. The State's use of the zoning power undeniably

1. *See,* Stegman, Housing in New York A Study of a City (1984-1985); Marcuse, *Report on Study of Displacement in New York City,* Community Serv Socy (Apr. 1984); Sternlieb and Listokin, Housing, Setting Municipal Priorities (1986); *The Illusive Low-Rent Apartments,* NY Times, Apr. 12, 1987, § 8, at 1.

shapes what and where various types of housing developments will be permitted and promoted, or restricted and discouraged.

The responsibilities laden in this power are in question here. Plaintiffs' position is that in the face of a severe shortage of decent and affordable housing, and the serious threat this constitutes for the public welfare, and given that undirected free market forces will not, of its own accord, create low- and moderate-income housing, the State, therefore, has an affirmative obligation under its zoning police power to adopt measures which will realistically promote low- and moderate-income housing. The fact of this affirmative obligation is the reason for this dissent from the majority's views. The nature of the obligation is the substance of the dissent and at the heart of the majority's error.

The facts surrounding this legal action began approximately 10 years ago when the City of New York, prompted by the tremendous influx of Asian immigrants to its Chinatown area and the simultaneous decline in the city's supply of decent housing, recognized the need to examine Chinatown's current and future economic and housing needs. The result of this year-long investigation was the publication in September 1979 by the Department of City Planning of the City of New York of the Manhattan Bridge Area Study (hereinafter the Study). Generally, the Manhattan Bridge Study Area (hereinafter MBSA) encompassed much of the lower East Side. Within that area, the Study's primary focus was on the smaller Chinatown Study Area, bounded generally by Delancey Street on the north, Allen Street on the east, Monroe and Madison Streets on the south, and Baxter Street and Bowery on the west.

The Study found that with the liberalization of the immigration laws, not only had the number of Chinese immigrants coming to the United States climbed dramatically between 1960 and 1970, but by 1970 New York City, with a Chinese population of 69,343, replaced San Francisco as the American city with the largest Chinese community. It was also projected that by 1980, New York City could be expected to have between 150,000 to 200,000 Chinese residents.[2]

The MBSA, in particular, was expected to be the primary home of these future immigrants. The Study noted that while some diffusion of the "better off and more established Chinese

---

2. It is now estimated that Chinatown alone is the home of an estimated 100,000 Chinese. (Lum, *Chinatown, A Community Grapples with its Future*, City Limits [Nov. 1985], at 16.)

households" had taken place outside MBSA into other boroughs and elsewhere in Manhattan, the MBSA would continue to be the major housing resource for the relatively recent immigrant families, the future immigrant families, those families who came to the United States long ago, but remain at the bottom of the economic ladder, and a small group of middle-income professionals and business persons who have located in the newest housing within the MBSA.

The income data of New York City's Chinese population reveals that they have a median income lower than that of non-Chinese families in New York State and New York City and lower than that of other Chinese families elsewhere in the United States. The Chinese in the Chinatown Study Area in particular fare the worst economically. In 1970, while 17% of the households in Manhattan were classified as living in poverty, the comparable figures within the MBSA ranged from a low of 20% in census tract 8 to a high of 33% in census tract 18.

In isolating those factors attracting Chinese immigrants to Chinatown, the Study observed that Chinatown offers its residents a cohesive, self-sufficient community, which serves as home, workplace, cultural center, financial center and retail and service hub for its residents. Problems of assimilation for new immigrants are minimized by the absence of language and cultural barriers and the opportunities for employment from Chinese-owned businesses within walking distance from their homes. The Study projected that Chinatown "will continue to be looked to as the area that meets the demand for professional and business services as well as for cultural and ethnic-community oriented activities."

The Study's analysis of Chinatown's housing facilities discloses the serious shortage of and extreme substandard nature of that housing. Of the 675 multifamily structures in the MBSA, 85% are obsolete, deteriorated old law tenements, built prior to 1901. Virtually all the units are rental apartments and are severely overcrowded. The low rents in the MBSA, compared to the rent levels elsewhere in the city, are due to the deteriorated conditions of this housing, which nevertheless remains in high demand due to population growth. The Study also noted that despite the poor conditions of the buildings, there was, as of 1975, already a noticeable upsurge in sales of buildings at amounts far in excess of the assessed valuations. Purchasers were paying three to four times the rent roll, a multiple significantly higher than for

the city as a whole, requiring that high commercial rents be charged to offset the low residential rates. This development is indicative of the type of real estate market boom present under gentrification conditions. The Study noted as well the dramatic increase in the number of Chinese-owned buildings, indicating an influx of foreign capital.

The Study concluded that additional and improved housing needed to be supplied for these predominantly low-income residents and for the future immigrants expected to settle in Chinatown. Yet, the Study also projected that the prognosis for future development of residential units was poor, given current zoning regulations. This conclusion was based on an analysis of only the zoning provisions of Old Chinatown, which has substantial commercial development and which area lies primarily outside the special district under review here.

Under New York City zoning provisions, density is controlled by limits on the floor area ratio (FAR), which determines the total floor area permitted in a building based on a multiple of the area of the lot on which the building stands. Zoning in Old Chinatown permits a more generous FAR for commercial buildings than for residential buildings. The Study concluded that these density restrictions, coupled with the more stringent height, setback and yard requirements for residential properties, strongly favored commercial over residential development. The Study then stated in a very conclusory fashion that as regards new development, it was not realistically possible, even with public subsidies, to meet the majority's needs, as the Old Chinatown land costs were too high. The Study contained no discussion of ways to promote the development of low- and moderate-income housing.

The only mention regarding the rehabilitation of the old law tenements was the observation that such rehabilitation would require increases in rents much beyond the moderate means of Chinese families in the MBSA, unless public subsidies were available.

Finally, the Study noted the lack of open recreational space, nursing homes and other health-related facilities and acknowledged that it had not conducted an analysis of community space needs.

Based on these findings, the Study made a number of proposals but cautioned that further study was necessary prior to any long-range planning.

Subsequently, the Department of City Planning drafted and submitted to the Board of Estimate proposed amendments to the New York City Zoning Ordinance, calling for creation of a special zoning district within the MBSA. The City Planning Commission adopted a resolution approving the amendment on June 22, 1981. The amendment called for new development to take place in the special district on vacant or substantially vacant lots at greater density levels than that permitted under the current density restrictions, in exchange for the provision by the developers of any of the following "amenities": "new community facility space, subsidized units for low and moderate income families, and selective demolition and rehabilitation of existing buildings." It is rather clear from the face of the introductory explanation to the proposed amendment, which noted such "new land use demands * * * as office use and housing for more affluent people" that new development in the Chinatown area would consist of luxury housing, with low-income housing relegated to the status of an "amenity" for the community.

On August 20, 1981, the Board of Estimate adopted the resolution along with a zoning map change, which together create the Special Manhattan Bridge District (SMBD).[3] This special district consists of the area bounded west of the Manhattan Bridge by Monroe and Madison Streets, St. James Place, Oliver Street and the Manhattan Bridge and bounded east of the Manhattan Bridge by Henry Street, Pike Street, Canal Street and the Manhattan Bridge. The stated goals of the creation of the SMBD are:

(a) to preserve the residential character of the community and encourage the development of new housing on sites which require minimal residential relocation;

(b) to promote the opportunities for people to live in close proximity to employment centers in a manner which is consistent with existing community patterns;

(c) to provide an incentive for the creation of new community facility space which is required to meet the unique needs of this community;

---

**3.** By separate resolution, the Board of Estimate also granted, on August 20, 1981, a special permit to the Overseas Chinese Development Corporation, Inc. permitting it to construct a high-rise luxury condominium tower at a higher density in exchange for providing a community facility. The permit was later revoked after an investigation revealed that the developers had resorted to illegal harassment and eviction procedures to vacate the property, so as to be eligible for the special permit.

(d) to permit new construction within the area which is sensitive to the existing urban design character of the neighborhood;

(e) to provide an incentive for a mixture of income groups in the new development so as to not substantially alter the mixture of income groups presently residing in the neighborhood;

(f) to promote the rehabilitation of the existing older housing stock, and thereby provide a renewed housing resource meeting modern standards at the same time protecting the character and scale of the community;

(g) to promote the most desirable use of the land in the area and thus, to conserve the value of land and buildings and thereby protect the city's tax revenues.

To accomplish these goals the new zoning regulations permit new development at greater density levels, by means of a special permit, on sites which were vacant or substantially vacant as of August 20, 1981. Developers are to be awarded density bonuses for providing the community with the amenities mentioned *ante*. Thus, the zoning regulations provide a floor area bonus of seven square feet in any new development for every square foot of space developed as a community facility. For every square foot of rehabilitated housing, the regulations provide the developer with a bonus of up to six square feet. To be entitled to this bonus, the developer must submit a relocation plan which shall provide for relocation of tenants within the SMBD, to the extent possible, and which shall affirm that no harassment of tenants has occurred. However, there is no requirement that rehabilitated units be maintained for low- or moderate-income families. Given the Study's prediction that, absent public subsidies, such rehabilitated units will be beyond the means of low- and moderate-income families, it is inevitable that this substantial bonus will only generate additional housing for more affluent tenants. For every square foot of low- and moderate-income housing produced in any new development, the zoning regulations grant a floor area bonus of only up to two square feet.

One year after adoption of the zoning amendment, defendant-appellant, Henry Street Partners, applied for a special permit to construct a 21-story condominium building with 87 units. To obtain a total floor area of 122,250 square feet, as opposed to the maximum floor area of 55,420 square feet permitted under the existing zoning, the developer agreed to

deed over 15,000 square feet to the YMCA to operate a community facility and agreed to provide $500,000 for the rehabilitation of low- and moderate-income housing within the SMBD. The City Planning Commission approved the special permit on August 30, 1982, and the Board of Estimate granted the permit on April 14, 1983.

In September 1983, plaintiffs-respondents instituted this class action suit for a declaratory judgment holding that the zoning ordinance creating the SMBD is unconstitutional under the New York State Constitution, for annulment of the SMBD and a directive to the defendant city agencies to create a new plan which provides a realistic opportunity for the construction of low-income housing, for revocation of any pending permits granted under the SMBD amendment, and for an order enjoining any tax abatement, reduction or credit to any project in the SMBD which does not provide for the construction or significant rehabilitation of low-income housing in Chinatown.

This action is brought by certain plaintiffs, in their individual capacity, who seek decent affordable housing in Chinatown, and Asian Americans for Equality, a nonprofit corporation, made up of residents of Chinatown committed to supporting the rights and goals of Asian Americans with regard to improved, affordable housing, job opportunities and working conditions.

Only the first and second causes of action need be dealt with here as the fourth cause of action was dismissed by Special Term, and plaintiffs have not appealed from that part of the order, and the third cause of action is now moot, as the majority notes, by the Court of Appeals action of annulling the permit granted to defendant Henry Street Partners in its decision *Chinese Staff & Workers Assn. v City of New York* (68 NY2d 359).

The first cause of action, raising a traditional zoning challenge, alleges that the zoning amendment, based as it was on the 1979 Study, was not the product of a "well considered plan" and, therefore, was an improper exercise of the police power. The second cause of action alleges that the zoning amendment is unconstitutional as it fails to provide a realistic opportunity for the much needed construction of new, or the maintenance and improvement of existing, low-income housing. Plaintiffs argue that creation of the SMBD has favored construction of luxury housing and has prompted real estate

speculation in and around the special district, which pressure will further erode the availability and retention of low-income housing.

Before submitting its answer, the city moved for summary judgment dismissing the complaint pursuant to CPLR 3211 (a) (7), for failure to state valid causes of action. The city argued that the enactment of the special district regulations was preceded by an extensive examination of the problems and needs of the Chinatown area and the regulations comprise a rational and balanced solution to the problems identified in the Study. Furthermore, the city argued that the New York Constitution and statutes do not require that municipalities actually ensure the construction of low- and moderate-income housing, and, in any case, the regulations actually contain incentives for the development of such housing. Justice David B. Saxe concluded that valid causes of action were stated as to the first, second and third causes of action. The court relied on the principles enunciated in *Berenson v Town of New Castle* (38 NY2d 102) and in the New Jersey cases, *Southern Burlington County N.A.A.C.P. v Township of Mount Laurel* (67 NJ 151, 336 A2d 713, *cert denied* 423 US 808) and *Southern Burlington County N.A.A.C.P. v Township of Mount Laurel* (92 NJ 158, 456 A2d 390).

I conclude that, based on the decisional law of New York, valid causes of action are stated and there is no need to rely on the decisions of any sister State. An analysis of the decisional law on zoning, as applicable in New York, bears this out.

The zoning power, the power to regulate the use of land, finds its justification in the broad police powers inherent in every State and, as with the other police powers, must be asserted for the public welfare and bear a "substantial relation to the public health, safety, morals, or general welfare." *(Euclid v Ambler Co.,* 272 US 365, 395.) Because what promotes the general welfare obviously varies from one community to another and varies from time to time, the power to zone contains a wide degree of elasticity and "the scope of [its] application must *expand* or *contract* to meet the new and different conditions which are constantly coming within the field of their operation" *(supra,* at 387; emphasis added).

With regard to the police powers in general, the United States Supreme Court, in *Nebbia v New York* (291 US 502) recognized the obligatory character of those powers when it

interpreted them as " 'not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation' " *(supra,* at 523, quoting from *City of New York v Miln,* 11 Pet [36 US] 102, 139).* As will be set forth below, this affirmative duty component of the police powers is recognized in the New York decisional law, including those decisions defining the zoning power in particular, and is the foundation from which plaintiffs' right to bring the within action arises.

The State of New York has empowered New York City under General City Law § 20 (25) to zone property within its domain through regulations which are: "designed to promote the public health, safety and general welfare and shall be made with reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular uses, the conservation of property values and the direction of building development, in accord with a well considered plan."

In light of the expansive nature of the power to zone and in accord with generally accepted principles of statutory construction, zoning ordinances are generally invested with a presumption of constitutionality, rebuttable by a showing that the regulation is arbitrary or lacks a substantial relation to the general health, welfare and safety of the community. *(Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville,* 51 NY2d 338, 343-344.) The unconstitutionality of a zoning ordinance must be demonstrated beyond a reasonable doubt, and the burden of proof is on the person challenging the regulation *(supra,* at 344).

Because effective zoning requires the "insights and the learning of the philosopher, the city planner, the economist, the sociologist, the public health expert and all the other professions concerned with urban problems" *(Udell v Haas,* 21 NY2d 463, 469), courts have universally required that zoning conform to a "well-considered plan" or "comprehensive plan", which plan forms the very "essence of zoning" *(supra,* at 469). Thus, in exercising their zoning powers, even in amending a zoning ordinance, local authorities are obligated to consider "the needs of the community as a whole * * * [and] act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives" *(supra,* at 469). Local authorities must consider alternatives which would minimize the adverse effects of a proposed change, and

changes must "not conflict with the community's basic scheme for land use" *(supra,* at 470, 472).

In comparison to other police powers, the power to zone has been exercised only relatively recently, with the first zoning ordinance enacted in this country being the New York City Zoning Resolution, adopted in 1916. As the Second Department, in *Berenson v Town of New Castle* (67 AD2d 506, 513), noted, the use of zoning originated in large cities where unregulated land use policies created serious threats to the public health and welfare. However, with the economic and infrastructural decline of the large urban cities, suburban and exurban localities seized upon zoning as a means to regulate growth and preserve the "particular amenities" of suburban and rural living. *(See, Matter of Golden v Planning Bd.,* 30 NY2d 359, 385, Breitel, J., dissenting; *Berenson v Town of New Castle, supra,* 67 AD2d, at 513.) By 1972, the Court of Appeals, in *Matter of Golden v Planning Bd. (supra),* recognized the resultant inequities and deleterious effects of zoning designed to protect insular interests at the expense of the greater public interest and welfare of the State. The court observed the following: "Experience, over the last quarter century, however, with greater technological integration and drastic shifts in population distribution has pointed up serious defects and community autonomy in land use controls has come under increasing attack * * * because of its pronounced insularism and its correlative role in producing distortions in metropolitan growth patterns, and perhaps more importantly, in crippling efforts toward regional and State-wide problem solving, be it pollution, decent housing, or public transportation". *(Supra,* at 374.)

In *Golden (supra),* the Court of Appeals was grappling with the constitutionality of a zoning ordinance which controlled local growth in order to assure a certain minimal level of public services to each new homeowner. Although acknowledging that the issues in that case were framed in terms of developers' due process rights to a profitable use of their land, and no showing was made in that case of any groups actually excluded from the Township of Ramapo, the court nevertheless recognized that developers' rights could not "realistically speaking, be viewed separately and apart from the *rights of others* ' "in search of a [more] comfortable place to live." ' " *(Supra,* at 375; emphasis added.)

The court foresaw the need for some sort of regional planning in order to fulfill the requirement that zoning regulations

advance the general public welfare, to rectify the inequities of prior zoning patterns and to promote the rights of those in search of a more comfortable place to live *(supra,* at 376). The court, nevertheless, at that point in time, and absent any proof of exclusionary purpose or impact, retreated from imposing any such requirement, hinting that a legislative solution would be welcomed *(supra,* at 376). Furthermore, no judicial remedy was required in that case, since the court found that the phased-growth zoning plan for the Township of Ramapo was not arbitrary and unreasonable *(supra,* at 380). The court did, however, pronounce most definitively that what it "will not countenance, then, under any guise, is community efforts at immunization or exclusion" *(supra,* at 378).

Judges Breitel and Jasen, parting company with the majority in *Matter of Golden v Planning Bd. (supra),* observed that the ordinance therein raised "vital constitutional issues * * * [related] to needed housing, planned land development under government control, and the exclusion in effect or by motive, of walled-in urban populations of the middle class and the poor * * * without regard to [the ordinance's] impact on the region or State" *(supra,* at 383 [Breitel, J., dissenting]). The dissenters, likewise, were quite concerned with the complex social and economic problems arising as a result of pressures to exclude poorer urban populations from areas of relative affluence and admonished against two outdated views of zoning: (1) that zoning decisions should be made without reference to regional problems and (2) that zoning was limited solely to the passive regulation of land development *(supra,* at 385, 390, 391, 393). On the latter point, the dissenters concluded that to correct some of the current housing problems "[t]here must be incentive to develop, or else there will be little new housing except that which government could afford to build" *(supra,* at 390).

Thus, the dissenters proposed that "a regional planning mechanism should be devised to create a pluralist suburbia in which each class could find its proper place" *(supra,* at 391).

In 1975, the Court of Appeals, in *Berenson v Town of New Castle* (38 NY2d 102, *supra)* did just that in an opinion authored by one of the dissenters in *Matter of Golden v Planning Bd. (supra),* Judge Jasen, and joined in by now Chief Judge Breitel and five new Judges.

The *Berenson* case *(supra)* was also brought on behalf of developers who wanted to build more profitable multifamily

dwellings in a township which excluded multifamily dwellings as a permitted use. Nevertheless, obviously building on the court's concerns in *Matter of Golden v Planning Bd. (supra)* that regional considerations should be taken into account and that the rights of developers could not be viewed separately and apart from those in search of decent housing, the *Berenson* court formulated the following test to determine the validity of a zoning ordinance challenged as having an exclusionary intent or impact:

"The first branch of the test, then, is simply whether the board has provided a properly balanced and well ordered plan for the community * * * Thus, in this case, the court must ascertain what types of housing presently exist in New Castle, their quantity and quality, and whether this array adequately meets the present needs of the town. Also, it must be determined whether new construction is necessary to fulfill the future needs of New Castle residents, and if so, what forms the new developments ought to take.

"Secondly, in enacting a zoning ordinance, consideration must be given to regional needs and requirements. It may be true, for example, that New Castle already has a sufficient number of multiple-dwelling units to satisfy both its present and future populations. However, residents of Westchester County, as well as the larger New York City metropolitan region, may be searching for multiple-family housing in the area to be near their employment or for a variety of other social and economic reasons. There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met * * *

*"So long as the regional and local needs for such housing were supplied by either the local community or by other accessible areas in the community at large, it cannot be said, as a matter of law that such an ordinance had no substantial relation to the public health, safety, morals or general welfare."* (38 NY2d 102, 110-111, *supra;* emphasis added.)

In adopting the requirement that regional needs and the greater public interest be met, in emphasizing that the locality must assess both the "quantity and quality" of needed housing and that the "social and economic" considerations regarding housing needs are legitimate concerns to be addressed under any comprehensive zoning plan, the *Berenson* court adopted a truly affirmative test designed to be economi-

cally and sociologically sensitive to peoples' housing needs. Thus, if the needs are for low-income housing, the zoning plan must accommodate this.

That the above concerns must be incorporated in a community's zoning plan was further clarified five years later in *Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville* (51 NY2d 338, *supra*). The *Kurzius* court, after reaffirming the two-pronged *Berenson* test, underscored the fact that the requirement of meeting regional needs "was fashioned to meet the demands of both the Constitution and New York's statutory scheme, because under either basis the regulation must promote the regional welfare" *(supra,* at 345).

Then, in a most significant pronouncement, which further illuminates when a zoning ordinance, facially valid, can nevertheless be invalidated, the court took the additional step of shifting onto the defendant the burden of proof of justifying a zoning ordinance once a showing of exclusionary intent or impact has been made. The court stated: "Generally then, a zoning ordinance enacted for a statutorily permitted purpose will be invalidated only if it is demonstrated that it actually was enacted for an improper purpose or if it was enacted without giving proper regard to local and regional housing needs and has an exclusionary effect. Once an exclusionary effect coupled with a failure to balance the local desires with housing needs has been proved, then the burden of otherwise justifying the ordinance shifts to the defendant" *(supra,* at 345).

In noting that in the case before it no showing was made of exclusionary purpose, and there existed "no proof that persons of low or moderate incomes were foreclosed from housing in the general region because of an unavailability of properly zoned land," (51 NY2d 338, 346, *supra)* the *Kurzius* court quite clearly confirmed the principle that proof of exclusion based on income would rebut the presumption of constitutionality with which a zoning regulation is normally invested. This is plaintiffs' argument.

Such an interpretation of the obligations a community must undertake in exercising the zoning powers delegated to it is consistent with other developing decisional law involving the right to housing, especially under NY Constitution, article XVII, which also limits and shapes the manner in which the zoning power is exercised.

As early as 1936, the Court of Appeals in *Matter of New*

*York City Hous. Auth. v Muller* (270 NY 333) recognized the social evils associated with unsanitary, substandard housing conditions and noted the inadequate supply of housing for persons of low income. The court declared that such conditions " 'constitute a menace to the health, safety, morals, welfare, and comfort of the citizens of the state * * * [which] *cannot be remedied by the ordinary operation of private enterprise' " (supra,* at 338-339; emphasis added). In language leaving no doubt of the forcefulness of the court's view, the court determined that it was the State's obligation through the use of its police powers to remedy this menace. The court stated: "The fundamental purpose of government is to protect the health, safety and general welfare of the public. All its complicated activities have that simple end in view. Its power plant for the purpose consists of the power of taxation, the police power and the power of eminent domain. *Whenever there arises, in the State, a condition of affairs holding a substantial menace to the public health, safety or general welfare, it becomes the duty of the government to apply whatever power is necessary and appropriate to check it." (Supra,* at 340-341; emphasis added.)

In terms of the degree to which the State should actively use its powers, the court noted that slums still exist, despite a total of 70 years of legislative acts aimed at curing or checking the problem *(supra,* at 341). The court concluded that it was therefore unavailing, at times, to argue that "private enterprise, curbed by restrictive legislation under the police power, is adequate and alone appropriate" *(supra,* at 341). Rather, the court acknowledged that there are instances when the State must exercise whatever power at its disposal "[t]o eliminate the inherent evil and to provide housing facilities at low cost" *(supra,* at 341). Such was essential, not to benefit any particular class of persons, but "to protect and safeguard the entire public from the menace of the slums" *(supra,* at 342).

As applicable to the State's exercise of its zoning power, the *Muller* holding requires that in the face of a serious general welfare issue, like the inadequate supply of low-income housing, the exercise of the power to zone for the public welfare must entail more than a mere setting aside of those restrictions which are physically prohibitive of certain types of housing development. Rather, the proper exercise of that power requires adopting meaningful measures which will realistically encourage the development of that housing which is needed in the relevant region and locality.

One year after the *Muller* decision *(supra),* prompted by the

aftermath of the Great Depression, NY Constitution, article XVII, was adopted, making it a constitutional mandate in New York for the State to provide for the needy. Section 1 states that "[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."

The duty of the State under section 1 was described as constituting "a definite policy of government, a concrete social obligation which no court may ever misread. By this section, the committee hopes to achieve two purposes: First: to remove from one area of constitutional doubt the responsibility of the State to those who must look to society for the bare necessities of life; and, secondly, to set down explicitly in our basic law a much needed definition of the relationship of the people to their government * * * [T]he obligation expressed in this amendment is mandatory in that the Legislature shall provide for the aid, care and support of persons in need, the manner and means by which it shall do so are discretionary. What it may not do is to shirk its responsibility which, in the opinion of the committee, is as fundamental as any responsibility of government." (Revised Record of 1938 Const Convention, at 2126.)

The legislative history of article XVII also discloses that the need for low-income housing was one of the concerns identified by the Constitutional Committee appointed to report on the pressing problems of the time. Even then the Committee found that most of the poor occupied substandard old law tenements, still the primary source of housing in Chinatown, and that there was a virtual "cessation of dwelling-construction by private enterprise for families of low-income" *(id.,* at 636).

The Court of Appeals has since had the opportunity to affirm that "[i]n New York State, the provision for assistance to the needy is not a matter of legislative grace; rather it is specifically mandated by our Constitution." *(Tucker v Toia,* 43 NY2d 1, 7.)￼It is a responsibility the State cannot shirk or evade, even though the State may have discretion to determine the means by which this objective is to be effected *(supra,* at 8).

With respect to housing, this very court in *McCain v Koch* (117 AD2d 198) determined that the City of New York was obligated under article XVII to provide emergency shelter for

homeless families *(supra,* at 214-215). The *McCain* decision is also significant in recognizing that although the adequacy of remedies are matters committed to the discretion of the Legislature, a matter this court hoped would be reexamined by the Court of Appeals, certain purported remedies may be so illusory as to amount to a denial of aid and a breach of the constitutional duty. Thus, this court determined that "the City DSS current policy of only providing cash allowances and information concerning housing availability amounts to the denial of aid to homeless families * * * In view of the scarcity of decent low-income housing, the City's policy simply ignores the brutal realities of plaintiff's situation. It contravenes both the letter and spirit of the State's affirmative obligation to aid all its needy residents under NY Constitution, article XVII, § 1." *(Supra,* at 216.) So, also, is it true that the instant zoning measures purportedly adopted to advance the welfare of the community can be demonstrated to be illusory and unresponsive to the brutal realities concerning the problems of obtaining adequate low- and moderate-income housing.

As the zoning power must be exercised consistently with the Constitution of New York State, it is obvious that in a community containing a large percentage of impoverished persons, article XVII also imposes an affirmative obligation to provide for the housing needs of that populace through the exercise of the zoning powers.

Even if the State has discretion in determining how it should fulfill its duties under the zoning power, the instant matter still present a justiciable controversy. When the Constitution or the Legislature mandates the performance of certain duties and a dispute arises whether the Legislature has failed to fulfill that duty "[t]he appropriate forum to determine the respective rights and obligations of the parties is in the judicial branch." *(Klostermann v Cuomo,* 61 NY2d 525, 536.) Even if in such litigation a court may be unable to order direct relief and may only be able to declare the rights of the parties involved, such will not make the action nonjusticiable. The very purpose of a declaratory judgment is to adjudicate the rights of the parties before a wrong occurs *(supra,* at 538). This adjudication is res judicata, and the parties are not free to ignore the court's declaration of rights *(supra,* at 538-539).

Moreover, other forms of relief are possible, for a court can compel a party to perform a duty that is mandatory as opposed to discretionary. "What must be distinguished" said

the court in *Klostermann v Cuomo (supra,* at 539) "are those acts the exercise of which is discretionary from those acts which are mandatory but are executed through means that are discretionary."

Thus, while a court may be unable or ill-equipped to itself determine the regional needs for housing under the *Berenson* mandate, it certainly can compel a Zoning Board to do so. In the meantime, the court may declare a zoning ordinance unconstitutional, leaving a municipality with no zoning regulations. Courts may also use their contempt powers and in some instances may grant specific on-site relief to developers. *(See, Berenson v Town of New Castle, supra,* 67 AD2d, at 523-524.)* Having concluded that the petition presents a justiciable controversy, we may now turn to the merits of this case.

Aside from its conclusion that no valid causes of action are asserted in this action, the majority asserts a number of tenuous objections concerning this litigation which should be briefly addressed and just as briefly dismissed for their insubstantiality. The majority concludes that the instant action is time barred and should be dismissed on that basis. It states that the action is really an article 78 proceeding seeking to review a decision of a governmental body, but brought as one for a declaratory judgment to avoid the four-month Statute of Limitations period contained in CPLR 217 for article 78 proceedings.

It is well known that "[t]he exercise of a power which offends against the Constitution may be attacked at any time." *(Lutheran Church v City of New York,* 27 AD2d 237, 239.)* The proper vehicle for effecting that review is a declaratory judgment *(supra,* at 239). This is particularly true of the constitutional review of regulations which are legislative in nature. Thus, the Court of Appeals has held: "While an article 78 proceeding is generally the proper vehicle to determine whether a statute, ordinance, or regulation has been applied in an unconstitutional manner *(Matter of Overhill Bldg. Co. v. Delaney,* 28 N Y 2d 449, 458), the rule is different when the issue is the constitutionality of legislative action. We have consistently held that a proceeding under article 78 is not the proper vehicle to test the constitutionality of legislative enactments". *(Matter of Kovarsky v Housing & Dev. Admin.,* 31 NY2d 184, 191.)* Among the cases relied on by the *Kovarsky* court was the Appellate Division decision in *Golden v Planning Bd.* (37 AD2d 236, 238-239, *revd on other grounds* 30 NY2d 359, *supra),* which specifically applied this principle to

zoning regulations. In *Golden v Planning Bd.,* the appellate court treated a proceeding brought under article 78 as an action for a declaratory judgment, since the action sought to test the constitutionality of a zoning ordinance. As the instant action is likewise a constitutional challenge to the creation of the SMBD, the action is properly brought as one for a declaratory judgment and may be brought at any time.

The majority also suggests, again without sound basis, that plaintiffs are precluded from litigating the constitutionality of the regulations and, in particular, the issue of whether the regulations resulted from a well-considered plan, because of this court's declaration, made only in its concluding and decretal paragraphs in the unrelated *Lai Chun Chan Jin v Board of Estimate* (92 AD2d 218), that the creation of the SMBD was a constitutional and valid exercise of legislative power. The majority also relies on the statement in the Court of Appeals affirmance of the above case, *Lai Chun Chan Jin v Board of Estimate* (62 NY2d 900, 902-903), that the creation of the special district was the result of a well-considered plan.

The *Jin* litigation was commenced by a different group of plaintiffs and was an article 78 proceeding challenging the very narrow issue of the procedural due process adequacy of the notice provisions advising the community of the proposed regulations to create the SMBD. *(Lai Chun Chan Jin v Board of Estimate, supra,* 92 AD2d, at 219.) This court found no defect in the notice provisions, and, in that narrow context, declared that the creation of the SMBD was a constitutional exercise of legislative power. The Court of Appeals affirmed this finding and additionally denied, on the basis of waiver, the petitioners' request, raised for the first time on appeal to that court, for an evidentiary hearing to determine whether the SMBD was adopted in conformance with a well-considered plan. The court then noted that it had read the 1979 Manhattan Bridge Area Study and it appeared to the court that the creation of the district resulted from a well-considered plan. Such a comment, obviously, has no preclusive effect, since the issue was not litigated and petitioners had no opportunity to present any arguments.

The narrowness of the holdings in the *Jin* cases was recognized by the Court of Appeals in the recent case, *Chinese Staff & Workers Assn. v City of New York* (68 NY2d 359) involving a challenge under the City Environmental Quality Review (CEQR) regulations to the issuance of the special permit to defendant-appellant herein, Henry Street Partners. The court

observed that the *Jin* litigation involved procedural due process issues and noted that "[a] separate constitutional challenge to the SMBD regulations and the special permit for Henry Street Towers is *sub judice* in the Appellate Division, First Department *(see, Asian Am. for Equality v Koch,* 129 Misc 2d 67)" *(supra,* at 362, n 1). It is this constitutional challenge we must now address.

Because matters extrinsic to the pleadings have been offered by both parties on the motion to dismiss for failure to state a cause of action, we must determine whether plaintiffs have a cause of action, not merely whether they have stated one. *(Guggenheimer v Ginzburg,* 43 NY2d 268, 275.) Dismissal is inappropriate, unless it is shown that a material fact as claimed by the pleader is not a fact at all, or unless it be shown that no significant dispute exists *(supra,* at 275).

To determine whether plaintiffs have a viable cause of action challenging the constitutionality of the zoning regulations, we must ascertain whether questions of fact exist as to whether the local Board's action was the result of a properly balanced and well-ordered plan for the community, which plan considered the needs of the community's large low-income population, and whether in enacting the zoning ordinance the local board considered the regional needs and requirements. *(Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville, supra,* 51 NY2d, at 345; *Berenson v Town of New Castle, supra,* 38 NY2d, at 110.) As established above, the principles enunciated in *Kurzius* and *Berenson* mandate that the Zoning Board consider the social and economic implications of and need for housing, as it is not merely the exclusion of certain types of structural units which is objectionable, a typical developer's concern, but the exclusion of certain classes of people in search of and in dire need of decent housing.

In applying the *Berenson* standard, the majority argues that the relevant "community" under the first prong of the test is New York City, not the SMBD. Because *Berenson (supra)* held that not every zone within a community need contain a balanced and integrated housing array and that all that is required is that the community itself be a balanced and integrated community, the majority contends that in New York City, any established special district need not contain a housing balance as long as the City of New York, as a whole, provides such. The majority then purports to hold that although the relevant community is New York City, a study

based on only a 14-block area of the city satisfies the *Berenson* requirement of a well-considered plan. Nowhere does it then discuss what the relevant region is for purposes of the second prong of the test, nor that regional considerations were made. Not only is the majority's analysis inconsistent, it totally disregards the realities of a city like New York City and involves a much too inflexible reading of the *Berenson* decision.

The *Berenson* test was enunciated at a time when zoning challenges were being made in growing, but still sparsely populated, suburban and exurban areas facing growth pressures from the outside. In contrast to New York City, such towns and townships were small, predominantly homogeneous communities. New York City, on the other hand, is a major metropolis with a complex economic and political structure and which contains a wide diversity of people of varying economic, religious, racial and ethnic backgrounds. It is a city unique in that it is made up of five counties, each with its own governing body. Finally, it is a city containing numerous compact communities.

Chinatown is recognized world-over as a distinctly flavored, cohesive ethnic community, serving as the economic, social, cultural and housing center for a large percentage of New York City's Chinese population. It is a community recognized as well, from a land use point of view, for its unique urban design and scale. Although the SMBD is a mere 14-block area, it is not a one-zone area, but an area which contains various use zones. The majority's emphasis on the statement in *Berenson (supra)* that each zone need not contain a balanced array of housing is therefore irrelevant in the context of Chinatown, which itself, small as it is, is parceled into numerous zones and is treated for zoning purposes as a complete community, with industrial, commercial, social and residential zoning uses.

Taken to its logical conclusion, the majority's view that no particular zoning district in New York City need contain a balanced housing array would mean the city could decide to exclude all low-income housing from Manhattan as long as the city, as a whole, provided low-income housing somewhere. Obviously, such could not have been the intent of *Berenson.* In fact, the *Berenson* court recognized that the complexity of a zoning ordinance must vary with the size and needs of a community. *(Berenson v Town of New Castle, supra,* 38 NY2d, at 110, n 2.)

The realities and complexities of New York City require that we acknowledge the appropriateness of recognizing the existence of distinct zoning communities within the larger city. Moreover, New York City, obviously sensitive to the cohesiveness of Chinatown as an industrial, commercial, residential, cultural and social center, chose to study it as a community for purposes of zoning and is now bound by that decision. Neither would it aid the majority much if it were correct in arguing that the relevant community for the first prong of the *Berenson* test is the entire City of New York. How then could a study of a 14-block area constitute a comprehensive plan for the community? On this ground alone plaintiffs would succeed in proving noncompliance with *Berenson (supra).*

Plaintiffs have made forceful arguments and submitted substantial evidence, uncontroverted by the defendants, to support their claims that the SMBD was not created as a result of a well-ordered plan, that the regulations failed to meet the constitutional obligation to zone for much needed low- and moderate-income housing, that, in fact, the zoning regulations will further shrink the available supply of affordable housing, thus having an exclusionary impact on Chinatown's predominantly low-income community, and that regional considerations were virtually ignored. Thus, the first and second causes of action must be sustained.

The 1979 Study, upon which the regulations are based, exposed the substandard, deteriorated and crowded nature of housing in Chinatown and noted both the present and future needs for additional housing for Chinatown's low-income residents, who comprise the overwhelming majority of its population. While it noted that Chinatown does have a middle-class professional population, the Study acknowledged that this was a very small part of the population, which occupied the newer housing in Chinatown, thus indicating that that group's housing needs might not be as serious as that of Chinatown's low-income residents. More recent statistics relied on by plaintiffs in support of their complaint and annexed as an exhibit to the pleadings, support the Study's conclusion that by and large Chinatown's residents are still predominantly low income. Those statistics show that approximately 86% of the families in Chinatown earn less than $10,000. The percentage of families earning over $50,000, those who conceivably could qualify for luxury apartments ranging in price from $170,000

to $500,000, varies from 4% to 1.1% in the three zip code areas of Chinatown.

Despite the Study's conclusion of additional low-income housing as the most pressing housing need of the community, nowhere in the stated purposes of the regulations is there even mention of providing low-income housing. While the stated purposes list promotion of the rehabilitation of the existing older housing stock as a goal, and the regulations provide a very generous incentive for developers to rehabilitate housing, giving them up to six extra square feet of bonus floor area on new developments for every square foot of rehabilitated housing, the regulations contain absolutely no requirement that such housing be maintained for low-income residents. This, despite the fact that the Study quite clearly recognized that, without some public regulation, rehabilitation of present housing units would require increases in rents beyond the means of Chinatown's residents. Thus, the present provisions and incentive for rehabilitation of the older housing stock would, as it stands today, actually shrink the available pool of affordable housing for Chinatown's low-income residents. Such a provision, therefore, sharply conflicts with the established community needs.

The relocation of residents from housing targeted for rehabilitation is also problematic, and nothing in the Study or the regulations demonstrates that alternative solutions were studied or even that the adverse effects of relocation were ever reviewed. Such considerations, however, are required in a comprehensive plan. (See, Udell v Haas, supra, 21 NY2d, at 470.) The regulations require developers to make a good-faith effort to relocate the tenants within the district to the extent possible. Considering that most of Chinatown's residents work in Chinatown, but at very low-paying jobs, making travel from outer boroughs and other areas of Manhattan cost prohibitive, relocation within Chinatown is critically important for these residents.

Nevertheless, the regulations apparently ignore that relocation within Chinatown is highly unrealistic given the figures, as documented by plaintiffs, of the present vacancy rate in Chinatown of 1.52%, a figure lower than the citywide rate or the Manhattan vacancy rate. Moreover, with the increasing rate of land speculation in Chinatown and the warehousing of apartments, as indicated by the evidence plaintiffs have submitted, the availability to low-income tenants of this 1.52% of vacant housing units is indeed highly questionable. Thus, that

any portion of Chinatown's low-income residents should be uprooted, dislocated and possibly lose their employment to provide rehabilitated housing for middle- and upper-income tenants is simply irreconcilable with the findings of the 1979 Study, the stated purposes of the regulations and, more importantly, the general welfare of the Chinatown community. It is no wonder that the 1979 Study itself called for the need for further study before its recommendations were followed.

Another arguably irrational element of the regulations, again irreconcilable with the 1979 Study, is the prominent emphasis given to providing community facilities. While the stated purposes nowhere mention the goal of providing low- and moderate-income housing, despite the Study's documentation of that need, specific mention is made in the regulation's purposes of providing community facility space. Even more disturbing is the fact that the most generous bonus incentive granted to developers is the bonus for developing community space. For each square foot of community space provided, a developer may be awarded up to seven square feet of bonus floor area space. Yet, the 1979 Study made only a passing reference to community facilities, noting that a specific analysis of Chinatown's needs for community facilities would not be undertaken therein. When was that analysis made, then? It is indeed arguable that the Zoning Board's decision to make community facilities the most lucrative bonus for developers was arbitrary and contrary to the community's most pressing needs.

In contrast to the generous treatment afforded community facilities and rehabilitated housing, it is highly questionable that the incentive provided in the regulations for furnishing low-income housing is a meaningful and realistic zoning measure, one " 'really designed to accomplish a legitimate public purpose.' " *(Berenson v Town of New Castle, supra,* 38 NY2d, at 107.) For each square foot of low-income housing provided, the regulations award a developer two square feet of bonus floor space. Plaintiff's assertion that such a measure is illusory is supported by the fact that of the two developers so far granted permits under the regulations, both have opted to provide community facility space in lieu of low-income housing. The two proposed projects, both of which have now been annulled, were to exist within blocks of each other. The regulations contain no limit or guidelines to determine how many of the only seven vacant lots left in Chinatown can provide community facilities in lieu of low-income housing.

Conceivably, given the lack of restrictions and given the generosity of the community space bonus, no low-income housing may be built in Chinatown under the regulations, and some low-income housing will, in all probability, be lost as a result of the generous bonus granted for the rehabilitation of the old housing stock. Substantial constitutional issues are, therefore, presented as to whether the regulations are indeed the product of a well-ordered plan for the community and meet the State's obligation to zone for the general welfare, including the needy population. This is especially so when these regulations may produce a net loss of low-income housing.

Plaintiffs additionally raise a serious question of fact as to the potential for "secondary" displacement of businesses and residents and the possible rise in homelessness as a result of these regulations. In claiming also to have the purposes of maintaining a mixture of income groups, without substantially altering the mixture of income groups presently residing in the neighborhood, and promoting opportunities for people to live close to their employment, consistent with existing community patterns, the regulations obviously contemplate that the economic structure and community character presently existing in Chinatown not be substantially altered. While that goal exists on paper, the plaintiffs have presented persuasive arguments demonstrating that, in reality, what may occur is a full-blown gentrification of Chinatown, caused by the introduction there of luxury housing.

Plaintiffs' statistics reveal that since 1977 there has been a dramatic resurgence of reinvestment in Chinatown, reflected in the number of sales of buildings, the sharp increase in sales prices and even the frequency with which ownership of particular units has changed. Plaintiffs submit evidence that this reinvestment surge is the product of both the influx of foreign capital into Chinatown, largely attributable to the political instability over the fate of Hong Kong, and the shifting of the New York City economy to a service-oriented economy, a shift which has triggered a migration back to the city of young professionals seeking quality housing.

Both these developments, originating as they do from outside the Chinatown community, ought to have been part of the regional considerations undertaken prior to adopting any regulations. Yet, there is no evidence that these regional impacts were studied. Plaintiffs' argument is that the gentrification process, whereby persons of relative affluence invest in

an underdeveloped area and upgrade the neighborhood economically, is being facilitated by the zoning regulations. By the technique known as upzoning, allowing greater density development, without securing low-income housing, which is essentially what the regulations herein do, the vacant lots left in Chinatown, of which only seven exist, will be marketed for their highest income producing capacity, that is, for luxury housing. Increases in land values result in greater pressures to demolish substandard, unprofitable buildings, in order to make way for increased luxury housing or commercial development. It increases the incentives of owners to warehouse housing units when they become vacant and to use illegal tactics to remove tenants, in order to use their buildings more profitably or sell them at new market prices.

Plaintiffs have not only cited studies attesting to upzoning's deleterious effects on low-income tenants, but have also cited specific examples of illegal evictions and of harassment already taking place in Chinatown. For example, after the Board of Estimate granted a permit under the new regulations to the Overseas Chinese Association to build a luxury housing tower, a city investigation uncovered evidence of illegal evictions and incidents of harassment engaged in by that developer to qualify the lot as a substantially vacant lot, upon which new development be permitted. The result of this investigation prompted the city to rescind the permit.

Displacement of commercial businesses is another potential problem which was left unaddressed in the Study and the regulations. With an increase in land values, comes an increase in unprotected commercial rents. With an influx of more affluent residents, comes an influx of businesses catering to more affluent needs. Nowhere is there any discussion of the effect of such changes on the economy of Chinatown and the employment opportunities of its residents. It is an area which must be studied, yet was not. It is simply unacceptable for defendants to presume, without evidence of any sort, that bringing affluent residents to Chinatown will automatically benefit Chinatown's residents.

In contrast to defendant's rosy, but unproven, assessment of the positive impact of bringing affluent residents to a low-income community, without securing low-income housing, plaintiffs answer with studies that show that revitalization of an underdeveloped neighborhood in a free market, without governmental control, invariably leads not to long-term economic integration, but long-term economic homogeneity.

Through secondary displacement residents may lose their housing, some will lose their employment, and some businesses unable to meet spiraling, unregulated rents will be forced out. Such conditions present a breeding ground for homelessness, a matter presently recognized as of the utmost public concern. *(See,* Social Services Law § 41 [the present condition of homelessness "is contrary to the public interest and threatens the health, safety, welfare, comfort and security of the people of the state"].)

On this point of secondary displacement, the Court of Appeals decision of *Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, *supra)* is extremely relevant. The court annulled the permit of defendant herein, Henry Street Partners, because the city had failed, pursuant to CEQR, to study the potential acceleration of the displacement of local residents and businesses as a secondary long-term effect of the project. The court did not make findings that such displacement would, in fact, take place, but did require that it be part of the review under CEQR. More relevant to this appeal, however, is the court's recognition, in *Chinese Staff & Workers Assn.,* that based on its decision in *Berenson v Town of New Castle* (38 NY2d 102, *supra),* such factors are also typical land use zoning problems. There is no circumventing the requirement, then, that such matters be studied before it can be said that a zoning regulation has been adopted pursuant to a well-considered plan. Again, on this basis alone, plaintiffs have raised a substantial question as to the validity of the regulations.

Plaintiffs point to numerous other deficiencies in the Study and regulations, all indicative of a haphazard approach to the creation of the special district. For instance, plaintiffs point out that the portion of the 1979 Study which analyzed zoning regulations only studied the zoning regulations of Old Chinatown, most of which lies outside the special district. It is truly disingenuous for the city to argue that on the one hand the plaintiffs must challenge the entire zoning ordinance of New York City to determine whether it provides a balanced plan, yet it may amend that ordinance and create a special district, after only analyzing the zoning regulations of an area which primarily lies outside that district.

The Study's absolute failure to determine the regional[4]

---

4. The regional analysis could be quite rationally limited to the Greater

needs for housing, and its failure to consider the effects of revitalization efforts in other underdeveloped neighborhoods of New York City, which may also be displacing poor and low-income tenants, are also indicative of the poorly thought-out nature of these regulations. There appears to have been a total disregard of regional considerations, despite the mandate in *Berenson (supra)* to consider such.

By stressing the harsh effects of dislocation of families, especially of families who are tied by language, culture and employment to a particular community, I do not under any circumstances mean to suggest that I would sanction any efforts of the State to preserve segregated housing patterns based on race, ethnicity, religion or income. Plaintiffs are not arguing that the Chinatown community should rigidly maintain a status quo condition or that it should not bear its fair share of whatever housing is needed within the relevant community and region, as required by *Berenson v Town of New Castle (supra)*. To the contrary, plaintiffs rely on the well-documented need for low- and moderate-income housing in Chinatown and the New York City region to support their argument that this zoning plan does not fulfill those needs as required by the *Berenson* decision. Their position is totally antithetical to that of communities wishing to exclude certain groups because of unfounded stereotypical fears or selfish desires to avoid any responsibility for regional inequities exacerbated by their own exclusionary practices.

Of course, providing housing for a mixture of different income groups is a legitimate zoning goal, but that goal must be carefully weighed against the presently compelling need for upgrading and retaining current affordable housing or developing new low- and moderate-income housing. More importantly, the State cannot adopt a zoning amendment which resolves this delicate balancing task without first having followed a constitutionally mandated process of calmly and deliberately studying the possible adverse effects of the amendment, such as dislocation of families and merchants or wholesale gentrification and alteration of the character of a community, and without studying a full range of alternative measures which can promote revitalization and integration of a low-income neighborhood, without incurring substantial

---

New York Standard Metropolitan Area, which presently includes New York City, Putnam, Rockland and Westchester Counties and is formulated on the basis of commutation flows and employment trends.

losses of its available stock of affordable housing, of which a shortage exists throughout the city as a whole.

Plaintiffs have cogently demonstrated that a question of fact exists as to whether there has been compliance with the *Berenson* test. Indeed, I am very troubled that without benefit of even a trial this court can conclude that the regulations herein are constitutionally valid despite the substantial deficiencies noted above and the irrationality of many of the provisions in the regulations, which do not appear to meet even the stated goals of the regulations, much less the compelling community need for decent affordable housing.

Land is a finite and precious resource. In Chinatown, in particular, open land is a scarce resource as well, with only seven identified vacant lots available. In the face of this scarcity of land available for development in Chinatown is the overwhelming and documented need for additional housing and improved housing for Chinatown's low- and moderate-income residents, those with the least choice in obtaining housing. For these residents Chinatown means more than a place where they have found affordable, albeit, substandard housing. It is where they work and socialize and where they have historical and cultural roots and connections. Creating a zoning environment which will facilitate large-scale luxury development without securing some degree of low-income housing and without guarding against increased shrinkage of low-income housing simply does not meet the constitutional requirement that the Zoning Board exercise its police powers for the benefit of the community and for the greater public welfare.

The changes about to take place in Chinatown will be irreversible. The harm to the community will be irreparable. The decision of this court to not even permit the community its day in court to challenge the constitutionality of this zoning amendment is unconscionable.

Accordingly, I must dissent and would affirm the judgment below.

ASCH, J. (concurring in part in dissent). The opinion written by Justice Ross for the majority and Justice Carro's writing in dissent are impressive for their thoroughness and in the presentation of their respective views.

Upon consideration, I would affirm the trial court and remand the case for trial, but only on the limited issue of whether New York City gave adequate consideration to the

need for low-cost housing. While the determination of the Court of Appeals in *Chinese Staff & Workers Assn. v City of New York* (68 NY2d 359) may be distinguished as dealing with a different aspect of this controversy, I feel that the holding and language of the Court of Appeals therein constrain us to follow its message.

The Manhattan Bridge Study, sponsored by the Department of City Planning of the City of New York, has reported that a substantial increase in Chinese residents could be expected in the study area and that large numbers of these people would be poor. Hence, it cited the overwhelming need to construct modern low-cost housing. The proposal adopted by the Board of Estimate, while giving lip service to such need, seems to mock this objective and, therefore, a hearing is required.

The zoning requirements of New York City limit the total floor area permitted in a building based upon a multiple of the area of the land on which the building stands. For the Special Manhattan Bridge District, regulations established a floor area bonus of seven square feet in any new development for every square foot of space developed as a community facility. Yet, for every square foot of low- and moderate-income housing produced in any new development, the zoning regulations grant a floor area bonus of only two square feet. It seems fairly obvious that any real estate developer who can read a profit and loss statement is going to choose the plan which gives the larger bonus of floor space. Thus, in the alternatives presented by the zoning resolutions there is a built-in financial prejudice against the building of low-cost housing. I believe that a trial is necessary to determine whether this issue was actually considered.

As the dissent notes, land on this planet is finite. However, as Malthus and others have observed, population is not. The sanctity of property, as manifested in the pristine formulation of our Constitution, reflected the value which our founding fathers placed on land. Through the nineteenth, and this century, as the population increased and as America gradually shifted to an urban industrial society from an agricultural one, our concerns and attitudes with respect to land use have also changed. The crushing effect of uncaring industrialization, especially on poor city workers, and the devastating impact of the economic depression of the twenties and thirties, were dealt with by legislation and case law diluting the protection of traditional property values. In the famous trinity of New Deal cases *(West Coast Hotel Co. v Parrish,* 300 US

379; *Labor Bd. v Jones & Laughlin,* 301 US 1; *Steward Mach. Co. v Davis,* 301 US 548), the Supreme Court finally shifted its protective mantle from private property to exhibit an increased solicitude for individual welfare and personal liberties.

Justice Carro, in his dissent, has made a careful exposition of the constitutional, statutory and case law which supports making living space available for all segments of the population. His position is supported by the ruling of the Court of Appeals in *Chinese Staff & Workers Assn. (supra).* In that case, the court said: "Our holding is limited to a determination that existing patterns of population concentration, distribution or growth and existing community or neighborhood character are physical conditions such that the regulations adopted by the City of New York pursuant to SEQRA require an agency to consider the potential long-term secondary displacement of residents and businesses in determining whether a proposed project may have a significant effect on the environment" *(supra,* at 368).

According to the latest studies, the segregated housing patterns which appeared to be breaking up in the 1960's and early 1970's are reasserting themselves in New York City and its suburbs (NY Times, Apr. 1, 1987, at A2). Both *Chinese Staff & Workers Assn. (supra)* and the dissent herein, in language throughout the respective writings, would encourage neighborhood self-perpetuation, and go beyond just insuring that there is low-cost housing available.

I fear that a precedent may be created by these cases which will help to perpetuate existing neighborhoods as sacred precincts for people already living there who wish to keep outsiders out. We must be wary of authority which may serve to preserve ghettos by creating separate communities for different ethnic groups. Such unrestricted precedents may frustrate the stated purposes of providing housing for those people who need help most.

Developers have stated that they expected community groups to use *Chinese Staff & Workers Assn. (supra)* to stall developments which might substantially change a neighborhood—including such projects as shelters for the homeless. "Any community group is going to use this to fight all that," said the president of the Real Estate Board of New York, Steven Spinola. "This gives them another hook to say they don't want something in their neighborhood." (NY Times, Nov. 20, 1986, at B7.) It has been recognized that "[b]olstered

by an expanding arsenal of legal tactics and emboldened by a growing perception that they can win, New Yorkers are increasingly opposing the city's attempts to open jails, shelters for the homeless, drug-treatment centers or anything else they fear will harm the character of their neighborhoods." (NY Times, Apr. 23, 1987, at A1.) The precatory language in Justice Carro's dissent by which he seeks to respond to the caveat herein expressed will not prevent its use for such result.

The majority, as well as the dissent, merge the city's interest in fostering low-cost housing with a need to perpetuate the existing Chinese community in the area. Pluralism in American society gives it vitality, and the preservation of the local Chinese community may well be worthwhile. However, to go beyond a concern with the lack of low-cost housing, and lump such need with a stated objective of perpetuating an ethnic enclave, may create a pernicious precedent.

SULLIVAN, J. P., and WALLACH, J., concur with ROSS, J.; CARRO, J., dissents in an opinion; ASCH, J., concurs in part in the dissent in a separate opinion.

Order, Supreme Court, New York County, entered on September 26, 1985, modified, on the law and on the facts, to the extent of granting city defendants' motion to dismiss the first and second causes of action, and except as thus modified, otherwise affirmed, without costs and without disbursements.